DEAN JACKSON HUDSON, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 8272

February 12, 1976                    545 P.2d 1163

[Rehearing denied March 23, 1976]

*Ohrenschall & Ohrenschall,* of Las Vegas, for Appellant.

*Robert List,* Attorney General; *George E. Holt,* District Attorney, *H. Leon Simon,* Chief Deputy District Attorney, and *Elliott A. Sattler,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

The woman, a Filipino National, was 25 years of age, married and the mother of three children. At approximately 8:15 on the evening of July 13, 1974, she was accosted by a man as she entered her car in the parking lot of the Silver Nugget in North Las Vegas, Nevada. Two hours prior to this fateful encounter she had arrived at the gambling establishment to play keno. She was intending to return home when the man, later identified as Dean Jackson Hudson, walked up behind her, grabbed her by the elbow, pressed what she believed to be a knife against her back and threatened to kill her if she did not do as he ordered. He then escorted her to his automobile. Upon reaching his pickup truck, he opened the door on the driver's side of the vehicle and pushed the woman inside. After himself entering the vehicle, Hudson administered several punches to the abdominal area of the victim inducing her to temporarily lose consciousness.

Hudson drove towards the outskirts of town and proceeded to a remote desert area where he stopped. He then grabbed the woman by the hair and commanded her to disrobe. She refused and, attempting to escape, struggled with Hudson striking him on the mouth and causing his lip to bleed. This

incident prompted him to convey further threats of death or injury to the victim if she did not comply with his demands.

Ultimately, the young woman was subdued. With Hudson's assistance she removed her clothes and was ordered to lie down on the seat of the car. In tears, she complied with the demand and Hudson proceeded to forcibly engage her in the act of sexual intercourse. After Hudson ejaculated in her vagina, he wiped off his penis and ordered his victim to engage him in the act of fellatio. Ignoring her protestations, he thrust his penis into her mouth and removed it only when she began emitting a choking sound. At that point, she attempted once again to escape. Hudson pursued and caught her and, clutching her by the hair, informed her that if she tried to escape again he would kill her. The victim was then shoved into the back of the truck and told to dress.

A short time later, the woman was released in the vicinity of the Silver Nugget and, as Hudson drove away, she was able to discern the license plate number of his automobile.

Frantic and dishevelled, she arrived home at approximately 10:00 p.m. Her husband transported her to the hospital where she was examined and treated. Her injuries included lacerations to an elbow and knee and bruises on her feet, legs, back, buttocks, arms, face and head. Tests disclosed the presence of semen in her vagina.

The following day, Hudson was summoned to the North Las Vegas Police Department where he was confronted by the woman who identified him as her assailant. He was thereupon admitted to police custody and on July 18, 1974, a criminal complaint was issued charging him with the commission of three crimes: (1) second-degree kidnapping committed with the use of a deadly weapon,[1] (2) rape, and (3) the infamous crime against nature.

Predictably, Hudson's version of the events which culminated in his arrest differed from that of the victim. He claimed that he met the woman while playing blackjack at the Silver Nugget. During the course of an ensuing conversation of sorts, Hudson invited her to dinner. The two left the establishment in his car and proceeded to his apartment where he picked up some additional money. After stopping at the apartment, located behind his parent's house, they drove to the Golden Nugget. There they gambled but did not eat. Leaving the Golden Nugget approximately 45 minutes after their

---

[1]During the trial the complaint was amended to omit the reference to a deadly weapon.

arrival for the ostensible purpose of returning the woman to the Silver Nugget where she said she expected to meet some friends to play bingo, they detoured to a remote desert area where he parked the car. Hudson contends that the couple then began kissing which, after a short while, led to love-making. He claimed that the woman willingly yielded to his advances and denied that the two ever engaged in the act of fellatio.

Following this erotic interlude, Hudson returned her to the Silver Nugget and then proceeded home where he spent the remainder of the relevant hours of the evening watching tele-vision with his parents and a friend. From beginning to end, Hudson claimed that the entire episode lasted approximately three hours (from 5:00 p.m. to 8:00 p.m.).

After a trial before a jury which obviously did not choose to accept Hudson's version of the events, he was found guilty of all three of the crimes of which he was charged. This appeal followed.

Hudson attacks his conviction in "scatter-gun" fashion speci-fying 11 separate points of error, five of which will not be entertained for his failure to raise them during the trial. Sher-man v. State, 89 Nev. 77, 506 P.2d 417 (1973). See Sollars v. State, 73 Nev. 343, 319 P.2d 139 (1957). After reviewing each of the five issues raised for the first time on this appeal, we have concluded that none are so fundamental as to suggest that the lower court proceedings did not comport with the requirements of due process or that appellant was afforded anything less than a fair trial. Cf. Garner v. State, 78 Nev. 366, 374 P.2d 525 (1962). In all, we are satisfied that appel-lant stands fairly convicted of the offenses with which he was charged and that the jury verdict is supported amply by the evidence.

1. Hudson claims that from the testimony of the prosecu-trix, it is evident that the offenses were committed in Cali-fornia and that the Nevada court therefore acted without jurisdiction. It is true that at one point during her testimony the woman stated that during her abduction she observed a road sign which indicated that Los Angeles was only 218 miles. However, she later stated on two separate occasions that the distance indicated on the sign was 280 miles. In light of the fact that the woman was a Filipino National who had

lived in the United States for only a short period of time and who obviously had a limited command of the English language, the trial court correctly determined that the inconsistency in her earlier testimony should not be weighed too heavily. It is also noted that other evidence clearly established that the crimes were committed in Nevada. Such evidence included testimony of the woman's husband that he accompanied her and a police officer to the site where she believed the crimes occurred which site was clearly within the boundaries of the State of Nevada. After reviewing the record, we are satisfied that the evidence in support of the finding that the crimes occurred in the State of Nevada is substantial. See King v. State, 87 Nev. 537, 490 P.2d 1054 (1971); Anstedt v. State, 89 Nev. 163, 509 P.2d 968 (1973). Furthermore, we find that the trial court indulged in no abuse of discretion by refusing to grant appellant an evidentiary hearing for the sole purpose of ascertaining jurisdiction. Warden v. Lischko, 90 Nev. 221, 523 P.2d 6 (1974).

2. At one point during the deliberations of the jury, the foreman informed the court that he believed the jury had reached an impasse. Because the jury had deliberated for only a relatively short period of time (five or six hours with a break for the evening meal) the court was not convinced that the impasse was insurmountable and proceeded to administer an "Allen Charge"[2] to the jury. Appellant argues that the instruction constituted prejudicial error and that, accordingly, we must reverse. We do not agree.

Even if we ignore the fact that appellant's trial counsel expressly stated that he had no objection to the instruction and assume for the purposes of discussion that a timely objection had been interposed thereto, reversal would not be warranted. In our view, the instruction was worded in such a manner as to avoid adulteration of the jury's verdict.[3] Cf.

---

[2]See Allen v. United States, 164 U.S. 492 (1896).

[3]The instruction reads as follows:

"The court instructs the jury that although the verdict to which each juror agrees must, of course, be his own conclusion, and not a matter of acquiescence in the conclusion of his fellows, yet in order to bring twelve minds to a unanimous result the jurors should examine with candor the questions submitted to them with due regard and deference to the opinions of each other.

"A dissenting juror should consider whether the doubt in his mind is a reasonable one, when it makes no impression on the minds of so many jurors equally honest, equally intelligent with him, who have

Azbill v. State, 88 Nev. 240, 495 P.2d 1064 (1972); State v. Clark, 38 Nev. 304, 149 P. 185 (1915).
Affirmed.

---

heard the same evidence with an equal desire to arrive at the truth under the sanction of the same oath.

"You are not to give up a conscientious conclusion after you have reached such a conclusion finally, but it is your duty to confer with your fellow jurors carefully and earnestly and with a desire to do absolute justice both to the State and to the defendant."