DAVID E. STAUDE, JR., Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 25416

January 4, 1996                    908 P.2d 1373

[Rehearing denied May 3, 1996]

*James J. Jackson,* State Public Defender, and *James P. Logan,*
Appellate Deputy Public Defender, Carson City, for Appellant.

*Frankie Sue Del Papa*, Attorney General, and *Rusty Jardine*, Deputy Attorney General, Carson City, for Respondent.

## OPINION

*Per Curiam:*

The victim in this case, Joseph Beeson, was an inmate at Ely State Prison (ESP). On August 20, 1990, he was found dead in his cell with a ligature around his neck and multiple stab wounds in his upper body. ESP inmates Kevin Reynolds, Todd Evans, and appellant David E. Staude were charged with crimes related to the killing. Reynolds pled guilty to second degree murder. Evans testified for the State against Staude in return for a gross misdemeanor charge. Staude was charged with murder. His first trial ended in a mistrial due to attrition of jurors. After a second

trial, he was convicted of first degree murder and conspiracy to commit murder.

Staude asserts a number of errors on appeal, including the ruling that evidence of his prior conviction was admissible for impeachment purposes and the instruction given the jury when it appeared to be deadlocked. Staude also asserts, and the State agrees, that the court improperly gave him a separate sentence for being a habitual criminal.

## FACTS

In August 1990, Joseph Beeson was housed in Unit 1-A, a "closed transition unit," at ESP. Beeson shared a cell with Tuffy Hampton. Beeson was white, and Hampton was black. The evidence showed that such an arrangement was highly unusual in prison because most inmates strongly disapprove of cellmates of different races. Hampton was then moved out of Unit 1-A to general population. No one in the unit would agree to bunk with Beeson. Appellant Staude was housed in Unit 1-A at this time. Prior to Beeson's death, Staude indicated to his caseworker at ESP that he was very upset and angry about black and white inmates being housed together in his unit.

On the afternoon of August 20, 1990, a correctional officer discovered Beeson lying facedown on his bunk, with blood on and around him. The staff doctor soon arrived and pronounced Beeson dead. Undersheriff Harry Collins investigated the crime scene that afternoon and found in Beeson's cell a prison-made knife and a shirt with the name "Little Red," inmate Kevin Reynolds's nickname. A cell-to-cell search of the unit uncovered a pair of blue sweatpants with human blood on them in the cell occupied by Staude and Evans. The pants were damp and inside a laundry bag marked "Staude." Collins noticed that Staude had several fresh scratches on his face, neck, chest, and arms, a puncture wound in his upper left thigh, and abrasions on the ulnar side (opposite the thumb) of both hands. The sweatpants had a hole in the upper left thigh area.

Evans testified as follows. He was housed with Staude in Unit 1-A when Beeson was killed. Around August 1, 1990, Staude and Reynolds told him they were going to attack Beeson. Evans suggested that they do it in Beeson's cell to avoid getting shot up. He provided Reynolds with a knife. On the day of the murder, they told Evans, "We're going to do it." Evans was out of his cell sitting at a table when he saw Staude and Reynolds go up to Beeson's cell; he later saw them come out of it around 2:30 p.m. Staude was wearing a blue shirt and sweatpants. When Evans returned to his and Staude's cell, Staude was shredding clothes and flushing them down the toilet. Staude told Evans that he and

Reynolds had killed Beeson: Beeson fought with them, Reynolds stabbed him a few times, and Staude strangled him with a shoelace. Staude said Reynolds had missed Beeson and stabbed Staude in the leg during the struggle.

Evans further testified that when he was charged in this matter, he agreed to testify in return for the State's reducing his charge to a gross misdemeanor, conspiracy to possess a dangerous weapon, and moving him to another prison. Evans had been a lieutenant in the Aryan Circle, a white supremacist prison gang, at the time of the murder. Staude wished to join the Aryan Circle, and killing Beeson was a means to do so.

The inmate in the cell above Beeson's when the murder occurred heard a fight through the vent. He later saw Staude with red on the side of his face. This inmate testified that Staude told him, "I can't believe we did it, or he did it. I can't particularly say. It was either, they did it, he did it, or we did it."

Dr. Ellen Clark, a pathologist, conducted the autopsy on Beeson and testified as follows. The ligature around Beeson's neck had caused his death. Beeson received several stab wounds; one was serious, penetrating his left lung and the sack surrounding his heart. The wounds on his body indicated that there had been a struggle. The ligature had been applied with "substantial force," and the abrasions on Staude's hands, which were worse on the outer edges of his little fingers, were fresh and could have been caused by the ligature which killed Beeson. The wound on Staude's left thigh was consistent with the puncture wounds on Beeson's body.

Staude did not testify. He called ten witnesses; nine of them were inmates, including Reynolds. Reynolds testified that he killed Beeson. He denied that Staude helped him do so. When asked if Evans helped him, Reynolds said he could not say because he did not want to be a snitch. He said that Evans's reputation was that he was "a dope fiend" and "a rat." Testimony for Staude by other inmates was to the effect that Evans was a liar and a drug addict. One inmate testified that Evans had admitted that he had killed Beeson and "put it off on Staude."

During deliberations, the district court received a note from the jury forewoman that the jurors were having trouble reaching a unanimous verdict. Staude objected to the instruction which the district court proposed to give the jury, which stated in part that a dissenting juror "should consider whether the doubt in his or her mind is a reasonable one, when it makes no impression on the minds of so many" of his or her fellow jurors. He requested a neutral instruction which applied to jurors voting for conviction as well as those having a reasonable doubt. The court did not change the instruction and gave it to the jury at about 4:40 p.m.

on November 10, 1993. The jury returned with a verdict almost five hours later at about 9:30 p.m. It found Staude guilty of first degree murder and of conspiracy to commit murder.

After the sentencing phase for the murder count, the jury sentenced Staude to life with the possibility of parole. The district court added a consecutive life sentence with the possibility of parole for being a habitual criminal and a consecutive six year sentence for conspiracy to commit murder.

## DISCUSSION

*The ruling that Staude's prior conviction for voluntary manslaughter was admissible for impeachment purposes*

Before his first trial, Staude moved in limine to exclude evidence of his 1987 convictions for voluntary manslaughter, burglary, and grand larceny. The district court denied the motion. At the second trial, Staude did not renew the motion to exclude the evidence, nor did he express a desire to testify. Staude now asserts that his prior conviction for manslaughter should have been excluded because it was an assaultive crime which had only slight probative value in regard to veracity and was highly prejudicial because it paralleled the crime for which he was being tried. *See* Givens v. State, 99 Nev. 50, 53, 657 P.2d 97, 99 (1983), *overruled on other grounds*, Talancon v. State, 102 Nev. 294, 301 n.3, 721 P.2d 764, 768 n.3 (1986).

Staude has failed to preserve this issue for appeal. A ruling on a motion in limine is advisory, not conclusive; after denial of a pretrial motion to exclude evidence, a party must object at the time the evidence is sought to be introduced in order to preserve the objection for appellate review. Teegarden v. State, 563 P.2d 660, 662 (Okla. Crim. App. 1977); *cf.* Daly v. State, 99 Nev. 564, 568, 665 P.2d 798, 801 (1983). We conclude therefore that this issue was not preserved for appellate review.

*The instruction given the jury when it appeared deadlocked*

Staude contends that the instruction given to the jury when it appeared deadlocked, often called an *Allen* charge, was error because it was not the instruction approved by this court in Wilkins v. State, 96 Nev. 367, 373-74 n.2, 609 P.2d 309, 313 n.2 (1980). Staude specifically argues that the instruction given was not neutral because it was directed only at jurors having a reasonable doubt.

The district court gave the jury an instruction which this court deemed satisfactory in Hudson v. State, 92 Nev. 84, 88-89 n.3,

545 P.2d 1163, 1166 n.3 (1976), four years before *Wilkins*. The instruction stated in part that a dissenting juror

> should consider whether the doubt in his or her mind is a reasonable one, when it makes no impression on the minds of so many jurors equally honest, equally intelligent, with him or her, who have heard the same evidence with an equal desire to arrive at the truth under the sanction of the same oath.

In contrast, the instruction later approved in *Wilkins* is directed at all jurors, not just those with reasonable doubts.[1]

The judicial concern in regard to *Allen* charges is that they not coerce jurors into reaching a verdict. This court "has reluctantly approved the *Allen* charge if it clearly informs the jury that each member has a duty to adhere conscientiously to his or her own honest opinion, and if it avoids creating the impression that there is anything improper, questionable or contrary to good conscience for a juror to create a mistrial." *Wilkins*, 96 Nev. at 373, 609 P.2d at 312. In order to ensure that juries are so informed, we expressly approved the American Bar Association version of the *Allen* charge and set it forth "for the future guidance of our district courts." *Id.*, 609 P.2d at 313.

The *Hudson* charge used by the district court improperly focused only on jurors supporting acquittal, and the court erred in not using the instruction approved in *Wilkins*. We expressly direct the district courts—should they find use of an *Allen* charge absolutely necessary—to employ the version set forth in *Wilkins*. However, we conclude that the charge given below was not unduly coercive in this case. It still clearly informed the jurors that they were not to give up a conscientious conclusion for the

---

[1]The approved instruction reads in whole:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. . Your verdict must be unanimous."

"It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict."

"You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

Wilkins v. State, 96 Nev. 367, 373-74 n.2, 609 P.2d 309, 313 n.2 (1980) (quoting ABA Project on Minimum Standards for Criminal Justice, *Standards Relating to Trial by Jury*, Commentary to § 5.4 (1968)).

sake of reaching a verdict. Also, after receiving the charge, the jury deliberated for nearly five more hours before reaching the guilty verdict. Although not dispositive of the issue, this fact suggests that the instruction did not coerce the jury into agreeing to a verdict. *See Wilkins,* 96 Nev. at 373, 609 P.2d at 313.

## *The separate sentence imposed for habitual criminality*

The jury sentenced Staude to life in prison with the possibility of parole for first degree murder. The district court added a consecutive life sentence with the possibility of parole for being a habitual criminal and a consecutive six year sentence for conspiracy to commit murder. The separate life sentence imposed for habitual criminality was error. *See* Cohen v. State, 97 Nev. 166, 169, 625 P.2d 1170, 1172 (1981); Lisby v. State, 82 Nev. 183, 189, 414 P.2d 592, 595-96 (1966). "The trial court must sentence on the substantive crime charged . . . , and then invoke the recidivist statute to determine the penalty." Hollander v. State, 82 Nev. 345, 353, 418 P.2d 802, 807 (1966).

Furthermore, in cases such as this one, enhancement of the jury-determined penalty by the trial court is improper. The Legislature has provided in NRS 175.552 that when a jury finds a defendant guilty of first degree murder, the jury shall determine the penalty to be given, absent a written stipulation otherwise by the defendant and both attorneys. In this case, the jury determined that Staude's sentence should be life imprisonment with the possibility of parole. The district court attempted to enhance that sentence by adding a consecutive life sentence for Staude's being a habitual criminal, pursuant to NRS 207.010. We hold that NRS 175.552 precludes habitual criminal enhancement by the court of a penalty for first degree murder imposed by the jury. We note, however, that since a jury should be apprised of relevant prior convictions during the penalty hearing after a first degree murder conviction and since the possible penalties for first degree murder are as severe or even more severe than those for habitual criminality, the inapplicability of habitual criminal enhancement to first degree murder penalties will not prevent juries from imposing appropriate sentences on habitual offenders.

Therefore, we vacate the second sentence of life imprisonment imposed in this case for habitual criminality. The lawful sentences, for murder and conspiracy to commit murder, stand.

## *Other assertions of error*

One remark by the prosecutor improperly asked the jury to put

itself in the victim's place. *See* Williams v. State, 103 Nev. 106, 109, 734 P.2d 700, 703 (1987); Jacobs v. State, 101 Nev. 356, 359, 705 P.2d 130, 132 (1985). However, Staude failed to object to the remark, and any prejudice was minimal. We have considered Staude's other assertions of error and conclude that they lack merit.

## CONCLUSION

Staude failed to preserve for appellate review the district court's ruling that evidence of his prior conviction was admissible for impeachment purposes. The district court erred in failing to give the jury the approved version of the *Allen* charge; however, the charge given did not coerce the jury into reaching a verdict. Accordingly, we affirm Staude's convictions for first degree murder and conspiracy to commit murder. The separate life sentence imposed for Staude's being a habitual criminal was error. We therefore vacate that sentence.