RICHARD BENNETT TABISH AND SANDRA RENEE MURPHY, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 36873

July 14, 2003 72 P.3d 584

[Rehearing denied October 24, 2003]

*William B. Terry,* Las Vegas, for Appellant Tabish.

*Herbert Sachs,* Las Vegas; *Dershowitz, Eiger & Adelson, PC,* and *Alan M. Dershowitz* and *Victoria B. Eiger,* New York, New York, for Appellant Murphy.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, and *James Tufteland* and *David T. Wall,* Chief Deputy District Attorneys, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

By the Court, ROSE, J.:

The State charged appellants Richard Tabish and Sandra Murphy by information with numerous crimes relating to three separate incidents: (1) the alleged robbery and murder by suffocation and/or poisoning of Lonnie Theodore "Ted" Binion at Binion's home in Las Vegas, Nevada, on September 17, 1998 (the "Binion counts"); (2) the removal of a large quantity of silver belonging to Binion from an underground vault located in a desert area near Pahrump, Nevada (the "silver counts"); and (3) the alleged July 1998 kidnapping, beating, and extortion of Leo Casey, who along with Tabish had a financial interest in a sand and gravel pit in Jean, Nevada (the "Casey counts").

Following a lengthy jury trial, Tabish and Murphy were both convicted of three Binion counts: first-degree murder; conspiracy to commit murder and/or robbery; and robbery relating to Binion's currency, coin collections, silver coins, and/or silver bars located at his Las Vegas residence. The jury also convicted both appellants of three silver counts: conspiracy to commit burglary and/or grand larceny; burglary; and grand larceny of the silver stored in the Pahrump underground vault. Tabish, but not Murphy, was convicted of four Casey counts: conspiracy to commit extortion; false imprisonment with the use of a deadly weapon; assault with a deadly weapon; and extortion with the use of a deadly weapon.[1]

---

[1]Although the jury also found Tabish guilty of conspiracy to commit kidnapping, the district court entered an amended judgment of conviction on October 16, 2000, dismissing that count.

The district court sentenced Murphy to serve a term of life in the Nevada State Prison with the possibility of parole after 20 years for murder, a consecutive term of 2 to 10 years for burglary, and four other concurrent terms ranging from 1 year in the county jail to a potential maximum prison term of 15 years.

The district court sentenced Tabish to serve two consecutive terms of 18 to 120 months in the Nevada State Prison for the extortion of Casey with the use of a deadly weapon; a consecutive term of life in the Nevada State Prison with the possibility of parole after 20 years for Binion's murder; a fourth consecutive term of 24 to 120 months for burglary of the underground vault, and concurrent terms ranging from 1 year in the county jail to potential maximum prison terms of 15 years for the convictions on the remaining counts.

Appellants assign numerous errors on appeal, including that: (1) improper and prejudicial joinder of their trials and the charges against them deprived them of a fair trial; (2) testimony regarding an alleged statement Binion made to his attorney prior to his death was improperly admitted at trial; (3) the State did not prove criminal agency; (4) the State's allegations in the charging document of aiding and abetting were unconstitutionally vague; and (5) juror misconduct deprived appellants of a fair trial. We conclude that the district court's refusal to sever the Casey counts from the remaining charges in the case and to give a crucial limiting instruction warrant reversal. We reject appellants' claim that the State failed to prove criminal agency.[2] In light of our determination that reversal is warranted for the reasons stated, we further conclude it is unnecessary to resolve the issues relating to the aiding and abetting charges alleged in the information and jury misconduct. Finally, we conclude that appellants' remaining assignments of error are without merit.[3]

## FACTS

Binion was found dead in his home in Las Vegas on September 17, 1998. At appellants' trial, Binion's drug supplier Peter Sheridan testified that he had sold Binion a large quantity of black tar heroin the day before his death. Heroin-smoking paraphernalia and traces of the drug were found in a bathroom near Binion's body. Toxicology reports obtained in connection with the autopsy that followed revealed the presence of heroin, Xanax, and Valium in Binion's blood.

---

[2]To the extent that either appellant also generally challenges the sufficiency of the evidence supporting the jury's verdict, we conclude that contention lacks merit.

[3]Although we have considered appellants' remaining arguments, we do not specifically discuss these contentions in this opinion.

Binion's live-in girlfriend, appellant Sandra Murphy, found Binion's body. An ambulance and police officers were summoned to the house, and paramedics unsuccessfully attempted to revive Binion. Police personnel then took pictures of the body and surrounding area, but they did not seal the area or otherwise preserve it as a crime scene. Their assumption at the time was that Binion died from a drug overdose, and no foul play was suspected. Murphy, described as hysterical, was taken to Valley Hospital.

The Chief Medical Examiner for Clark County, Dr. Lary Simms, performed the autopsy on Binion's body the following day. Dr. Simms noted the presence of various marks on Binion's body and took photographs of them. He concluded that Binion's death was caused by an overdose, but could not determine whether the death was suicide or accidental.

Several months before his death, Binion lost his gaming license to operate the family's business, the Horseshoe Casino. Thereafter, he removed from the Horseshoe his large personal collection of silver coins and bars worth approximately $8 million. In the summer of 1998, Binion employed appellant Richard Tabish to build an underground vault for the silver on a vacant parcel of land Binion owned in Pahrump near his family's ranch. In late August or early September 1998, Binion alerted the local Nye County Sheriff's Office that the silver had been moved to the underground vault and asked them to keep an eye on the area. Tom Standish, one of Binion's lawyers, testified at trial that he was present when Binion told Tabish that if Binion died, Tabish should retrieve the silver from the vault so that greedy Binion family members would not try to keep the silver from Binion's daughter, Bonnie.

Murphy and Tabish met through Binion. They became friends and then allegedly became lovers. On the night of September 18, 1998, Tabish telephoned the Nye County Sheriff and told him he was coming to Pahrump to dig up and remove the silver in the vault. Tabish explained that Binion had requested him to retrieve the silver in the event of Binion's death. But after Tabish and two other men, Dave Mattsen and Mike Milot, had loaded the silver into their trucks, they were stopped by Nye County Sheriff's officers. They were detained for a few hours, arrested, and then released on bail.

Police returned to Binion's house to gather more evidence about four weeks after Binion's death. During that four-week period, the alleged crime scene had not been secured and various people had access to the house and the den where Binion's body was found. A comparison at trial of police photographs from the date of Binion's death and from the second police investigation a month later clearly showed that objects had been moved. Paul Dougherty, an expert in law enforcement procedures and crime scene reconstruction, testified for the defense that the police had been irresponsi-

ble and unprofessional in gathering evidence at the house and in failing to secure it as a crime scene.

About a week after Binion's death, Binion family members hired a private investigator, retired homicide detective Tom Dillard, to investigate Binion's death. Dillard conducted numerous interviews and consulted experts in his investigation. Approximately six months after Binion's death, Dr. Simms, the medical examiner who had performed the autopsy, examined Dillard's materials and this time concluded that Binion's death was a homicide. The Clark County District Attorney's Office subsequently charged Tabish and Murphy, alleging they had robbed and murdered Binion at his house and had then stolen the silver from the underground vault.

Appellants' trial lasted six weeks and included 115 witnesses. The witnesses consisted in substantial part of numerous medical experts, many of them physicians hired by each side to analyze the cause and manner of Binion's death. Except for Dr. Michael Baden, all of the doctors, including Dr. Simms, agreed that Binion's death was caused by an overdose of heroin, Xanax, and Valium.[4] These witnesses disagreed somewhat over which of the drugs were present in Binion's body in lethal amounts. Nevertheless, whether they testified for the State or the defense, they agreed that the drugs had killed Binion, probably working together in a synergistic fashion to make them more toxic together than each drug would have been by itself.

In contrast, Dr. Baden, a physician and expert witness for the prosecution, testified that Binion did not die from a drug overdose, but had instead been suffocated by one or more persons. Although Dr. Baden did not personally examine Binion's body, based on his extensive experience as a medical examiner and trial consultant, he concluded that certain marks on Binion's face, chest, and wrists demonstrated that Binion's hands had been restrained, and that someone had covered his nose and mouth and applied pressure to Binion's chest, perhaps with a knee, to hasten his death. Other doctors testifying for each side related innocent explanations for the marks on Binion's body, including that Binion may have bumped into things while under the influence of drugs, that a paramedic had rubbed Binion's sternum to make sure he was dead, and that Binion suffered from dermatitis.

Binion's estate lawyer, James Brown, testified at trial that Binion had called Brown's office the day before his death and had asked Brown to change the terms of his will. Brown testified that Binion had said to him, "Take Sandy [Murphy] out of the will if she doesn't kill me tonight. If I'm dead, you'll know what happened." Although Brown did not report this statement to police

---

[4]Dr. Simms also observed that some heroin users take Xanax to augment their heroin high.

until several days after Binion's death, he testified that he wrote down what Binion had said less than twenty-four hours after he learned that Binion was dead.

Other State witnesses testified regarding appellants' suspicious behavior and other unusual activities at the residence around the time of Binion's death: Binion's maid testified that Murphy sent her home early the day before Binion's death and told her not to come to work the next day; Binion's gardener testified that drapes that were ''always'' open were closed that day and the dogs were behaving strangely; a private investigator testified that Murphy and Tabish telephoned each other fewer times than usual on that day; and Bonnie Binion testified that valuable items including cash and antique coins were missing from the Binion house.

Several State witnesses testified that Tabish had severe financial problems, thus supporting the State's theory that his need for money provided a motive for him to kill Binion and steal his silver. Kurt Gratzer, a witness who knew Tabish in Montana where Tabish had also resided, said Tabish had discussed killing Binion with him and asked for his help. Gratzer told a friend, Timothy Boileau, that Tabish wanted him to come to Las Vegas to kill a heroin addict who was dating a stripper. Appellants countered these allegations with evidence that Binion's death may have resulted from an accidental overdose or a suicide.

As noted, Tabish was also tried on charges relating to Leo Casey.[5] Casey and Tabish both had a financial interest in the sand pit, which Casey estimated contained raw materials worth about $10 million. Casey claimed that in July 1998, two months before Binion's death, he was kidnapped and beaten by Tabish and Steve Wadkins, the manager of a company that had a contract to wash sand provided by the sand pit to concrete companies. Casey testified that Tabish and Wadkins forced him at gunpoint to drive approximately twenty miles to the Jean sand pit, where they beat him about the head with a telephone book, injuring him and knocking his toupee askew. Casey stated that the men berated him, poked a knife under his fingernails, restrained his hands with a pair of thumbcuffs,[6] held a gun to his head, and told him that they would

---

[5]Murphy was originally charged with the Casey counts as well, but these charges against her were dismissed before trial.

[6]Thumbcuffs were also found in a bag of silver coins discovered by James Brown and Tom Dillard behind a television in Murphy's room at the Binion house on September 24, 1998. Brown testified that after they discovered the bag, Dillard removed it from the residence. Later, Dillard returned the bag to the residence in April 1999 where its contents were examined by an appraiser. During the appraisal, a pair of thumbcuffs were discovered mixed in with the silver coins in the bag.

kill him if he did not sign documents transferring his property interest in the sand pit and confessing that he had embezzled money.

Casey admitted at trial that he had been involved in a scheme to defraud investors in a trucking and construction company in which Tabish had an interest. He testified that he was afraid of the men and became even more so when they threatened to bury him in the desert and proceeded to dig a ''shallow grave'' with excavation machinery at the sand pit. Casey said, ''[T]hey threatened they were going to cut my fingers off and my wrists off, and I was extremely shaken.''

Eventually, Tabish and Wadkins drove Casey back into Las Vegas. They picked up John Joseph, and visited an attorney's office, where documents were prepared transferring Casey's interest in the sand pit to the others. Casey testified that his hands were bleeding slightly as he signed the documents. Notaries at the attorney's office testified, however, that Casey did not look as though he had just been beaten.

According to Casey, when they released him, Tabish and the other men told him they would kill him, sexually assault his ex-wife, and kill his daughters if he did not leave Nevada at once. He said that he moved out of the state and was contacted by police eight months later regarding the incident. Casey also testified that Tabish had bragged to him at some time prior to this incident that he was sleeping with Ted Binion's girlfriend, Sandra Murphy, and was using her to get to Binion's valuable silver collection.

Before and during trial, appellants made numerous motions for severance. The district court refused to sever the Casey counts from the other counts in the information or to grant Tabish and Murphy separate trials. The district court did instruct the jury, however, that the evidence respecting the Casey counts was not to be considered as evidence against Murphy.

The jury deliberated for eight days and found Tabish and Murphy guilty of the charges specified above. Murphy filed motions for a new trial and for a judgment of acquittal. Tabish also sought a new trial, as well as a judgment notwithstanding the verdict. The district court denied the motions. This joint appeal followed.

## DISCUSSION

### I. *Failure to sever charges*

Appellants argue that improper and exceptionally prejudicial joinder deprived them of their right to a fair trial. They contend that the Casey counts should have been tried separately from the remaining counts because the charges were not based on a ''common scheme or plan'' and trying the charges together was uncon-

stitutionally prejudicial.[7] We conclude that the district court improperly denied appellants' motions to sever the counts and that the error was not harmless beyond a reasonable doubt.

Decisions to join or sever are left to the discretion of the trial court and will not be reversed absent an abuse of discretion.[8] An error arising from misjoinder is subject to harmless error analysis and warrants reversal only if the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' "[9] As discussed below, we conclude that misjoinder of the Casey counts with the other charges did have a substantial and injurious effect warranting reversal of appellants' convictions, and requiring remand to the district court for a new trial on the allegations against appellants respecting the murder and robbery of Binion and the burglary and larceny of the underground vault. We reject the State's contentions that all of the counts charged were part of a common scheme or plan, that combining the counts was not unfairly prejudicial and promoted judicial economy, that the counts had to be combined to give the jury the complete story of the crimes, or that the counts would have been cross-admissible as prior bad acts in separate trials. We further conclude, however, that the case against Tabish on the Casey counts did not present the jury with the same close issues of fact, and the improper joinder of the charges did not have the same substantial and injurious influence on the jury's consideration of the charges against Tabish on the Casey counts. Therefore, we conclude that the error in that respect was harmless beyond a reasonable doubt, and we affirm Tabish's conviction on the Casey counts.

### A. *Common scheme or plan*

The State contends that the charges were properly joined pursuant to NRS 173.115 because they were part of a common scheme or plan. The State claims in particular that the

> common thread of all these criminal acts is greed, money and the Jean Sand Pit. The focus of all these crimes revolved around the Jean Sand Pit. Leo Casey had to be eliminated so that Tabish could obtain the sand pit. Ted Binion had to be

---

[7]NRS 173.115 provides in pertinent part:

Two or more offenses may be charged in the same . . . information in a separate count for each offense if the offenses charged . . . are:
> (1) Based on the same act or transaction; or
> (2) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

[8]*Amen v. State,* 106 Nev. 749, 756, 801 P.2d 1354, 1359 (1990).

[9]*Robins v. State,* 106 Nev. 611, 619, 798 P.2d 558, 564 (1990) (quoting *United States v. Lane,* 474 U.S. 438, 449 (1986)).

murdered in order to obtain his silver and fund the Jean Sand Pit. The connection between all of these crimes is sufficient to justify the joinder of all these offenses.

The State also emphasizes the similarities between Casey and Binion: that Casey and Binion were both older than Tabish, both had valuable assets worth stealing, both were allegedly restrained by Tabish (and/or Murphy in Binion's case), and both were attacked in ways leaving no visible injuries (although the State's theory of Binion's murder relies heavily on marks on his wrists that the State argues are evidence of applied restraint).

We agree with appellants, however, that money and greed could be alleged as connections between a great many crimes and thus do not alone sufficiently connect the incidents. Additionally, we note that Casey transferred his interest in the sand pit well before Binion's death. This lapse of time between the events undermines the State's theory that Tabish and Murphy killed Binion because Tabish was desperate for money to run the sand pit, and that Tabish attacked Casey to obtain his interest so he could then kill Binion to finance the project. Further, although both victims were older men with substantial assets, the alleged crimes themselves were quite distinct: Casey was allegedly victimized with a phonebook, a gun, a knife, and thumbcuffs, while Binion was allegedly murdered by a forced overdose of drugs or by suffocation.

The State cites to several Nevada cases defining a common scheme or plan or allowing connected counts to be tried together, but these cases fail to support the State's claim that the Casey and Binion counts were sufficiently connected to support joinder.[10] This court has previously held that even certain similar counts could not be joined because their connection in time was too remote. In *Mitchell v. State,* for example, this court concluded that two separate incidents forty-five days apart involving social drinks at a particular bar followed by alleged sexual assaults could not be considered part of a common scheme or plan.[11] In this case, the joined incidents were dissimilar, and fifty days separated the Casey

---

[10]For example, the State cites to the following: *Tillema v. State,* 112 Nev. 266, 914 P.2d 605 (1996) (counts for two automobile burglaries sixteen days apart joined with store robbery committed immediately after second burglary); *Howard v. State,* 102 Nev. 572, 729 P.2d 1341 (1986) (counts for robbery and murder properly joined when defendant used stolen items to lure murder victim within a day of the robbery); *State v. Boueri,* 99 Nev. 790, 672 P.2d 33 (1983) (counts for twelve incidents of embezzlement from same ultimate victim were properly joined); and *Gibson v. State,* 96 Nev. 48, 604 P.2d 814 (1980) (counts joined for prison escapee who committed two auto thefts in a row to get away from the prison).

[11]105 Nev. 735, 782 P.2d 1340 (1989).

incident from the alleged murder and theft of the silver. We are simply not persuaded that the State sufficiently established the alleged connections between the counts to demonstrate a common scheme or plan.

### B. *Prejudice*

We further conclude that appellants' trial on the Binion counts was unfairly prejudiced by the joinder.[12] In assessing the potential prejudice created by joinder, this court has held that " '[t]he test is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever.' "[13] When some potential prejudice is present, it can usually be adequately addressed by a limiting instruction to the jury. The jury is then expected to follow the instruction in limiting its consideration of the evidence.[14]

In this case, the district court instructed the jury that it was not allowed to consider evidence from the Casey counts in determining Murphy's guilt as to the counts alleged against her. Murphy argues that this limiting instruction was inadequate, partly because the evidence in the Casey counts was so "graphic." Moreover, Murphy contends, the State "guarantee[d] that the jury would consider the Casey matter in determining whether the Binion crimes were committed" by emphasizing in its closing arguments its view of the similarities between the Casey incident and the separate allegations in the other counts against both appellants.[15] In light of the graphic nature of the Casey evidence, coupled with the State's closing argument, we are unable to conclude beyond a reasonable doubt that the limiting instruction was sufficient to mitigate the prejudicial impact of the joinder on the jury's consideration of appellants' guilt on the remaining counts.[16] The erroneous joinder

---

[12]*See Floyd v. State,* 118 Nev. 156, 164, 42 P.3d 249, 255 (2002) ("Even if joinder is permissible under NRS 173.115, a trial court should sever the offenses if the joinder is 'unfairly prejudicial.' " (quoting *Middleton v. State,* 114 Nev. 1089, 1107, 968 P.2d 296, 309 (1998))).

[13]*Honeycutt v. State,* 118 Nev. 660, 667, 56 P.3d 362, 367 (2002) (quoting *United States v. Brashier,* 548 F.2d 1315, 1323 (9th Cir. 1976)).

[14]*Spencer v. Texas,* 385 U.S. 554, 562 (1967).

[15]For example, one prosecutor said in closing, "I want to draw some comparisons for your consideration. Leo Casey, older gentleman, Ted Binion, older gentleman. Leo Casey owed Rick Tabish money. Ted Binion owed Rick Tabish money. . . . Leo Casey thumb-cuffed, Ted Binion, wrists were restrained. Leo Casey beat in a manner which would leave no marks, Ted Binion suffocated in a manner that would leave no marks."

[16]*Cf. U.S. v. Smith,* 795 F.2d 841, 851 (9th Cir. 1986) (holding that refusal to sever charges was not manifestly prejudicial where prosecution and court took great pains to avoid emphasizing the charges were somehow connected).

was especially prejudicial in Murphy's case, although it was manifestly prejudicial to Tabish's trial on the other counts as well.

This court has recognized the view of the United States Court of Appeals for the Ninth Circuit that joinder may be so prejudicial " 'that the trial judge [is] compelled to exercise his discretion to sever.' "[17] Prejudice created by the district court's failure to sever the charges is more likely to warrant reversal in a close case because it may "prevent the jury from making a reliable judgment about guilt or innocence."[18] In our view, the Binion charges presented the jury with a close case, and the joinder of the Casey counts rendered the trial of the Binion counts fundamentally unfair.[19]

Additionally, the limiting instruction was inadequate to prevent the improper "spillover" effect of inappropriate joinder.[20] In *Bean v. Calderon*,[21] the prosecution joined counts alleging two separate murders. The Ninth Circuit Court of Appeals reversed one of the murder convictions because the consolidation of cases led the jury to infer criminal propensity. In other words, there was an unacceptable risk that the jury found the defendant guilty of the second murder simply because it thought he was a bad person for having committed the first murder.[22] In *Bean,* this impermissible inference allowed the jury to convict on the prosecution's weak case for one of the murders by relying on the stronger evidence of the other murder.[23] Similarly, here the State's weaker case on the Binion counts was bolstered by combining it with the stronger case against Tabish on the Casey counts. Thus, the prejudice in this case constitutes the same type of due process violation that was found in *Bean*.[24]

---

[17]*Lisle v. State,* 113 Nev. 679, 694, 941 P.2d 459, 469 (1997) (quoting *United States v. Lewis,* 787 F.2d 1318, 1321, *opinion amended,* 798 F.2d 1250 (9th Cir. 1986)).

[18]*Zafiro v. United States,* 506 U.S. 534, 539 (1993); *see also Lewis,* 787 F.2d at 1322 (considering relative strength of evidence underlying joined charges as factor showing undue prejudice).

[19]*Featherstone v. Estelle,* 948 F.2d 1497, 1503 (9th Cir. 1991); *Bean v. Calderon,* 163 F.3d 1073, 1084 (9th Cir. 1998).

[20]*See Lisle,* 113 Nev. at 689, 941 P.2d at 466 (discussing "spillover" effect of a jury's unfavorable impression of a defendant influencing its determination of guilt).

[21]163 F.3d 1073.

[22]*See* NRS 48.045(1) (subject to certain exceptions, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion").

[23]*See Bean,* 163 F.3d at 1083.

[24]*See id*. at 1083-84. It appears that the district court also recognized the prejudicial effects of the joinder when it commented late in the trial that it should have granted the motions to sever the Casey counts from the Binion counts.

## C. *Judicial economy*

The State also argues that joinder promoted judicial economy and that severance should not be granted on " 'guilt by association' " alone.[25] Although judicial economy is an appropriate consideration in deciding whether severance is appropriate, it must be weighed against the possible prejudice to defendants.[26]

The State's argument carries little force when considered in the context of this case. Tabish's two co-defendants Joseph and Wadkins, who were charged only in connection with the Casey counts, had their cases severed from Tabish and Murphy's before the preliminary hearing based upon a stipulation with the State. Therefore, another trial was expected to be held on the Casey counts in any event. Further, Tabish and Murphy's co-defendants in the silver theft counts, Mattsen and Milot, were granted severance and were also scheduled for a separate trial. In short, all of the other defendants' trials were severed from Tabish and Murphy's, and there was a potential for at least two other trials at the time of Tabish and Murphy's trial. Under these circumstances, no waste of judicial resources could have been reasonably anticipated from Tabish being tried separately from Murphy on the Casey counts, along with Joseph and Wadkins. In fact, to promote judicial economy in a far less potentially prejudicial manner, the district court could have held one trial for all the defendants involved in the Casey counts and one trial for those involved in the Binion and the silver counts. Therefore, we conclude, considerations of judicial economy were far outweighed by the manifest prejudice resulting from the joinder.

## D. *Complete story*

The State contends that even if the Casey counts were improperly joined, they were otherwise admissible under the "complete story" exception. NRS 48.035(3) provides:

> Evidence of another act or crime which is so closely related to an act in controversy or a crime charged that an ordinary witness cannot describe the act in controversy or the crime charged without referring to the other act or crime shall not be excluded, but at the request of an interested party, a cautionary instruction shall be given explaining the reason for its admission.

---

[25]*Lisle,* 113 Nev. at 689, 941 P.2d at 466 (quoting *United States v. Boffa,* 513 F. Supp. 444, 487 (D. Del. 1980) (citation omitted)).

[26]*See Honeycutt,* 118 Nev. at 667, 56 P.3d at 367 (joinder must be so manifestly prejudicial that it outweighs the dominant concern with judicial economy); *Lisle,* 113 Nev. at 689, 941 P.2d at 466 (holding that trial court must consider possible prejudice to government resulting from two time-consuming, expensive, and duplicative trials).

This court has interpreted NRS 48.035(3) quite narrowly. For example, in *Bletcher v. State,* we held that it·was reversible error for the district court to admit evidence of the defendant's drug possession during his prosecution for second-degree murder.[27] We emphasized that the presence of drugs was not so interconnected with events leading to the victim's death that the witness had to refer to the drugs to explain those events.[28]

In this case, the Casey events could have easily been described without reference to the Binion counts, and vice versa. The fact that Tabish's accomplices in the underground silver incident and in the Casey incident had separate trials from Tabish and from each other demonstrates the incidents are descriptively separable. Therefore, we conclude that the complete story exception does not apply to these counts.

### E. *Cross-admissibility*

The State argues that joinder of the Binion and Casey counts was permissible because of cross-admissibility. Specifically, the State contends that evidence of the Binion counts would have been admissible at Tabish's separate trial on the Casey counts, and evidence of the Casey counts would have been admissible at a joint trial of appellants on the other counts.[29] The State asserts that the Casey prior bad act evidence would have been admissible at such a joint trial of the other counts under NRS 48.045(2)[30] for the limited purposes of showing motive (that Tabish was a greedy person and needed money to run the sand pit), plan (to obtain money to run the sand pit, as discussed above), and the identity of Tabish and Murphy as Binion's killers (because of the alleged similarities between the attack on Casey and the death of Binion). We disagree.

As this court held in *Tinch v. State,* to deem a prior bad act admissible, the district court must first determine outside the presence of the jury that "(1) the incident is relevant to the crime

---

[27]111 Nev. 1477, 1480, 907 P.2d 978, 980 (1995).

[28]*Id.; see also Flores v. State,* 116 Nev. 659, 662-63, 5 P.3d 1066, 1068 (2000) (evidence that co-defendant had been convicted of earlier murder in which same gun was used was not admissible against defendant in murder prosecution under complete story doctrine); *cf. Ochoa v. State,* 115 Nev. 194, 200, 981 P.2d 1201, 1205 (1999) (evidence of prior drug transactions between victim and defendant was allowed to show history of friction which escalated to murder).

[29]*See Mitchell,* 105 Nev. at 738, 782 P.2d at 1342 (discussing cross-admissibility).

[30]NRS 48.045(2) provides "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.''[31]

Although, in our view, the relevance is somewhat tenuous, the Casey counts arguably have some relevance to the remaining counts for the various purposes advanced by the State. Appellants note that money and greed could be considered ''common motives for almost every crime under the sun,'' including these crimes. The Casey counts are also arguably relevant for the other purposes, *i.e.,* to demonstrate a plan to obtain money to run the sand pit and the identity of Tabish and Murphy as Binion's killers.

Additionally, we agree that the State could have met the second *Tinch* requirement and proven the Casey counts at a *Petrocelli* hearing by clear and convincing evidence.[32] The testimony of Leo Casey regarding the attack on him provided the jury with strong, more than sufficient evidence to convict Tabish of the crimes beyond a reasonable doubt, a higher standard than required for the admission of prior bad act evidence under our holdings in *Tinch* and *Petrocelli*.

In our view, however, the district court would have manifestly abused its discretion in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.[33] As discussed above, the introduction of the Casey counts into the trial on the remaining counts caused an improper spillover effect to occur, and the danger of unfair prejudice was substantial. Although the Casey counts may have some relevance for the purpose of demonstrating common motive, plan, and identity, that limited probative value was substantially outweighed by the danger of unfair prejudice.[34] Therefore, we reject the State's contention respecting the cross-admissibility of the counts, and we conclude that the joinder was not supportable on this basis.[35]

---

[31]*Tinch v. State,* 113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

[32]*Petrocelli v. State,* 101 Nev. 46, 692 P.2d 503 (1985).

[33]It is within the district court's discretion to admit or exclude evidence, and that determination will not be disturbed unless manifestly wrong. *See Walker v. State,* 116 Nev. 670, 6 P.3d 477 (2000); *Petrocelli,* 101 Nev. at 52, 692 P.2d at 508.

[34]*See, e.g., Tavares v. State,* 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) (holding that it is ''heavily disfavored'' to use prior bad act evidence to convict a defendant ''because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges''); *Flores v. State,* 116 Nev. 659, 662-63, 5 P.3d 1066, 1068 (2000) (holding that probative value of evidence of a prior murder to show identity and motive for another murder was far outweighed by the danger of unfair prejudice).

[35]We do not suggest that all evidence relating to Tabish's interactions with Casey and their interests in the sand pit is inadmissible. For example, the State

In sum, the district court's improper denial of the motions to sever the Casey counts from the other counts unfairly prejudiced both appellants in their trial on those other counts. With respect to the Binion counts and the silver counts, we conclude that the error was not harmless beyond a reasonable doubt, and we reverse appellants' convictions on those counts and remand for a new trial on those matters alone. The prejudicial impact of the improper joinder on Tabish, as it related to his trial on the Casey counts, was not as severe. Given the strong and more than substantial evidence presented against Tabish on the Casey counts, we conclude that the improper joinder was harmless beyond a reasonable doubt as it relates to his conviction on those counts. Therefore, we affirm Tabish's conviction on the Casey counts.

## II. Failure to sever appellants' trials

Murphy argues that she and Tabish should have been granted separate trials altogether.[36] The Casey counts against Murphy were dismissed before appellants' joint trial. Therefore, if Murphy were to have had a separate trial, she would have been tried only on the counts related to the murder and robbery of Binion and the counts related to the theft of the underground vault.[37] Although Tabish and Murphy should not have been subjected to a joint trial including the Casey counts, we conclude that they were properly tried together for the remaining charges as co-defendants. The improper joinder of the Casey counts with the remaining charges does not foreclose a joint retrial of Tabish and Murphy on those remaining charges on remand.

## III. Hearsay statement of decedent

Appellants contend that the district court abused its discretion by permitting Binion's estate attorney, James Brown, to testify that

could appropriately present limited evidence relating to Tabish's financial transactions with Casey for the purpose of establishing Tabish's financial condition, his need for funds, and his motivation for committing the acts alleged in the Binion and the silver counts. We emphasize, however, that the highly prejudicial impact of Casey's graphic testimony respecting the brutal treatment he received at the hands of Tabish and his accomplices substantially outweighs the limited probative value of that evidence with respect to the allegations in the Binion and the silver counts.

[36]NRS 173.135 provides in relevant part: "Two or more defendants may be charged in the same . . . information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

[37]Tabish and Murphy apparently do not challenge the joinder of the counts involving the underground silver vault with the counts alleged to have occurred at Binion's Las Vegas residence.

Binion telephoned him the day before his death and said, "Take Sandy [Murphy] out of the will if she doesn't kill me tonight. If I'm dead you'll know what happened."

Prior to trial, appellants moved to exclude the statement as impermissible hearsay.[38] The district court ruled that the statement was admissible under NRS 51.105(1), which provides: "A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health, is not inadmissible under the hearsay rule."

In *Shults v. State,* this court held that "[i]n order for the state of mind exception to be applicable, the victim's state of mind must be a relevant issue, the relevance must be weighed against prejudice, and a proper limiting instruction must be given or objectionable testimony deleted."[39] The decision to admit or exclude such evidence is within the sound discretion of the district court and the district court's determination will not be disturbed unless manifestly wrong.[40] We conclude that the district court manifestly abused its discretion in admitting the statement without a limiting instruction.

The district court found that Binion's state of mind was a relevant issue because the defense theories offered at trial included suicide and accidental death.[41] The record shows that the district court also weighed the relevance of the statement against its prejudicial impact and ruled the statement to be admissible.

Assuming that the statement was relevant to rebut the defense theories, we conclude that the district court abused its discretion under *Shults* in admitting the statement without an appropriate limiting instruction. The prejudicial impact was great: the statement strongly implied Murphy killed Binion. Moreover, the relevance of the statement was equivocal, even though there was little other evidence of Binion's state of mind before his death.[42] But if

---

[38]Pursuant to our recent holding in *Richmond v. State,* 118 Nev. 924, 932, 59 P.3d 1249, 1254 (2002), appellants' argument was adequately preserved for appellate review. The issue was briefed and argued prior to trial, and the district court made a definitive ruling to admit the statement.

[39]96 Nev. 742, 751, 616 P.2d 388, 394 (1980) (citing *United States v. Brown,* 490 F.2d 758, 773-78 (D.C. Cir. 1974)).

[40]*Walker v. State,* 116 Nev. 670, 674-75, 6 P.3d 477, 479 (2000).

[41]*Shults,* 96 Nev. at 751, 616 P.2d at 394 (victim's state of mind is at issue when defendant claims self-defense, accidental death, or suicide); *see also Brown,* 490 F.2d at 767 (where a defendant claims self-defense, suicide, or accidental death, the need for admission of such statements "overcomes almost any possible prejudice").

[42]*See Brown,* 490 F.2d at 764 n.17 ("in a case where the mental state is provable by other available evidence and the danger of harm from improper use

the statement was relevant to show Binion's state of mind at the time he made the statement, the exception still does not allow the statement to be used as evidence of the intent or conduct of anyone else—in this case, Murphy.[43] The district court did not give a limiting instruction advising the jury that the statement was only admissible for the limited purpose of showing Binion's state of mind.

Harmless error analysis applies to hearsay errors.[44] We are unable to conclude that the error was harmless beyond a reasonable doubt in this case.[45] In *Shults,* this court noted that the evidence against the defendant was "incredibly strong," thereby rendering a similar error harmless.[46] In *Downey v. State,* on the other hand, this court concluded that such an error was reversible because "the evidence of guilt [was] not overwhelming, and guilt [was] based solely on circumstantial evidence. The hearsay in this case [was] extremely prejudicial, both because of its content and because it [was], in effect, testimony from the dead victim."[47] In this case, as in *Downey,* the State's evidence on the Binion counts was highly circumstantial and not overwhelming. The statement is akin to testimony from Binion after his death. Without a limiting instruction, the risk was unacceptable that the jury would improperly consider the statement as evidence of appellants' intent or conduct during its eight days of deliberation, particularly in light of the State's closing argument that "truer words were never spoken." Accordingly, we cannot conclude based on this record that the district court's failure to give a limiting instruction was harmless beyond a reasonable doubt.

## IV. *Proof of criminal agency*

Appellants argue that, as a matter of law, insufficient evidence was adduced at trial to establish the corpus delicti for the murder charge, *i.e.,* that Binion died as the result of a criminal act rather than from some other cause. We disagree.

by the jury of the offered declarations is substantial, the judge's discretion to exclude the declarations has been recognized" (quoting *McCormick on Evidence* § 294, at 696 (2d ed. 1972))).

[43]*See* Graham C. Lilly, *An Introduction to the Law of Evidence* § 7.13, at 287-88 (3d ed. 1996).

[44]*Shults,* 96 Nev. at 751, 616 P.2d at 394.

[45]*See Brown,* 490 F.2d at 777 ("Good limiting instructions are vital where the possibility exists that the jury will consider the testimony for an improper purpose.").

[46]96 Nev. at 751, 616 P.2d at 394.

[47]103 Nev. 4, 7, 731 P.2d 350, 352 (1987); *see also Summers v. State,* 102 Nev. 195, 202, 718 P.2d 676, 681 (1986).

To establish probable cause, the State must show that: (1) a crime has been committed, and (2) the defendant committed that crime.[48] The first part of this test is known as the corpus delicti, and to establish it in a murder case, the State must demonstrate: (1) the fact of death, and (2) that death occurred by the criminal agency of another.[49] The corpus delicti may be established by circumstantial evidence only,[50] and at trial the State bears the burden of establishing the corpus delicti beyond a reasonable doubt.[51] This court has stated that ''the proper standard [of review for these claims] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have concluded beyond a reasonable doubt that [the victim's] death was caused by a criminal agency.''[52]

As noted above, Dr. Baden testified that he had concluded that Binion had been suffocated by one or more persons. Although there was conflicting testimony and the question of whether Binion died as a result of a criminal agency is a close one given his heroin habit, we conclude that, based on Dr. Baden's testimony, a rational trier of fact could have found beyond a reasonable doubt that Binion's death was caused by a criminal agency.[53] Accordingly, we reject this contention.

We further note that the district court correctly determined that the jury did not have to agree unanimously on a single factual theory of criminal agency in order to convict appellants of murder. As noted, the State presented two expert witnesses, Doctors Simms and Baden, on the issue of whether a criminal agency was the cause of Binion's death. Doctor Simms testified that Binion's demise was the result of an induced overdose of a mixture of heroin,

---

[48]*Frutiger v. State,* 111 Nev. 1385, 1389, 907 P.2d 158, 160 (1995).

[49]*Id.*

[50]*Azbill v. State,* 84 Nev. 345, 351, 440 P.2d 1014, 1018 (1968).

[51]*Middleton,* 114 Nev. at 1103-04, 968 P.2d at 306-07; *Azbill,* 84 Nev. at 352, 440 P.2d at 1018.

[52]*Frutiger,* 111 Nev. at 1391, 907 P.2d at 161 (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)); *see also Sheriff v. Dhadda,* 115 Nev. 175, 980 P.2d 1062 (1999).

[53]Appellant Murphy filed a motion with this court during the pendency of this appeal ''to bring new information to the court's attention.'' Attached to the motion were affidavits and photographs purporting to set forth new expert opinion evidence regarding the cause of Binion's death. The appellate court record in this case consists of the record made and considered in the district court below. This court cannot consider matters not properly appearing in the record on appeal and therefore cannot consider this new evidence. Therefore, we deny the motion. *See Carson Ready Mix v. First Nat'l Bk.,* 97 Nev. 474, 635 P.2d 276 (1981); *see also* NRS 177.165.

Xanax, and Valium. Dr. Baden opined that Binion was suffocated through a process known in the literature as "burking." Both opinions were, to a degree, contradictory.

At trial, appellants did not object to the admissibility of this conflicting body of evidence. Rather, appellants chose to pit the credibility of the State's witnesses against experts for the defense who testified that Binion's death was most likely accidental or self-induced. Appellants also requested the district court to instruct the jury that, to convict, the jurors must unanimously agree on the factual theory of criminal agency; that is, they must either unanimously agree that Binion was suffocated or unanimously agree that he was poisoned. The district court rejected this proposed instruction and concluded that the jury did not have to be unanimous on the facts or theory of how the appellants committed first-degree murder. Rather, the district court concluded that the Constitution only required the jury to unanimously agree that the evidence established appellants' guilt of first-degree murder. We agree with the district court.

In *Schad v. Arizona,* the United States Supreme Court observed:

> We have never suggested that in returning general verdicts . . . the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."[54]

Although we have not previously specifically addressed whether jury unanimity on a single theory of criminal agency is necessary to establish the corpus delicti, we have cited *Schad* with approval in rejecting the contention that the State should be required to elect a single theory of prosecution, *i.e.,* between premeditated or felony-murder.[55] We now conclude, in accord with the reasoning of the plurality opinion in *Schad,* that when conflicting or alternative theories of criminal agency are offered through the medium of competent evidence, the jury need only achieve unanimity that a criminal agency in evidence was the cause of death; the jury need not achieve unanimity on a single theory of criminal agency.

---

[54]501 U.S. 624, 631 (1991) (plurality opinion) (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) (footnotes omitted)).

[55]*See Moore v. State,* 116 Nev. 302, 304, 997 P.2d 793, 794 (2000).

## CONCLUSION

The failure to sever the Casey counts from the other charges and the admission of the hearsay statement without a limiting instruction unfairly prejudiced both appellants in their trial on the Binion and the silver counts. The errors were not harmless beyond a reasonable doubt. Neither of the errors, however, had the same severely prejudicial impact with regard to Tabish's conviction on the Casey counts,· and in that respect, we conclude the errors were harmless beyond a reasonable doubt. Accordingly, we reverse appellants' convictions on the Binion and the silver counts and remand for a new trial on those matters alone. We affirm Tabish's conviction on the Casey counts.[56]

AGOSTI, C. J., BECKER, J., and YOUNG, Sr. J., concur.

SHEARING, J., concurring in part and dissenting in part:

I agree with the majority that the convictions of Sandra Murphy and Richard Tabish for first-degree murder, conspiracy to commit murder and/or robbery, and robbery must be reversed, but I would affirm the remaining convictions.

I agree with Justices Maupin and Leavitt that the decision not to sever the Casey counts from the Binion counts was within the district court's discretion and did not constitute an abuse of discretion.[1] However, I agree with the majority that the admission of a statement made by Binion prior to his death without any limiting instruction and the emphasis by the State on the truth of that statement are so prejudicial as to taint the convictions relating to the Binion murder.

The district court was within its discretion in admitting the testimony of Binion's estate attorney regarding Binion's statement to him the night before he died. The attorney testified that Binion said: "Take Sandy out of the will if she doesn't kill me tonight. If I'm dead, you'll know what happened." Even though the statement is hearsay, it was admissible to show Binion's state of mind to rebut the defense allegation that Binion may have committed suicide.[2] However, Binion's statement was clearly not admissible for the truth—namely, that if he were dead the next day, Murphy killed him. The purpose of the hearsay rule is to preserve the right of confrontation and cross-examination and to allow the jury to judge

---

[56]THE HONORABLE CLIFF YOUNG, Senior Justice, having participated in the oral argument and deliberation of this matter as Justice of the Nevada Supreme Court, was assigned to participate in the determination of this appeal following his retirement. Nev. Const. art. 6, § 19; SCR 10. THE HONORABLE MARK GIBBONS, Justice, did not participate in the decision of this matter.

[1]See Honeycutt v. State, 118 Nev. 660, 667, 56 P.3d 362, 367 (2002).

[2]NRS 51.105.

the credibility of the witness and the basis for the statements. If Binion had just been informed of Murphy's affair with Tabish, it is reasonable to infer that he would have wanted to take Murphy out of his will. However, there is no indication that he had a basis for thinking she would kill him. In fact, the testimony of the people who talked to Binion, including Binion's attorney and the attorney's wife, indicates that Binion was casual and not in fear of his life. And if Binion had really thought he would die that night, it would be logical to infer that he would have changed his will immediately rather than putting it off to a later date.

Despite the fact that the hearsay statement was admitted for the purpose of showing Binion's state of mind, no instruction limiting the use of the statement for that purpose was ever given. In fact, the State argued at trial that once a statement is admitted under NRS 51.105, it may be considered for its truth. That is wrong. An instruction limiting its use to consideration of Binion's state of mind was required. In *Shults v. State,* this court stated: "In order for the state of mind exception to be applicable, the victim's state of mind must be a relevant issue, the relevance must be weighed against prejudice, and a proper limiting instruction must be given or objectionable testimony deleted."[3]

The district court determined that the statement was more probative than prejudicial. That determination was within the district court's discretion.[4] However, its failure to give a limiting instruction was not.

Perhaps the lack of a limiting instruction for the hearsay statement could have been considered harmless error if the evidence of murder were overwhelming, but it was not. I cannot find the admission of the hearsay statement without a limiting instruction harmless error when the State used and emphasized the truth of the statement. In closing argument, the State repeated the statement, "Take Sandy out of the will if she doesn't kill me tonight. If I'm dead, you'll know what happened." The State then commented to the jury: "Truer words were never spoken."

This use of the hearsay statement of the decedent constitutes plain error and requires reversal of the convictions for first-degree murder and conspiracy to commit murder and/or robbery.

I do not agree that the convictions for conspiracy to commit burglary and/or grand larceny, burglary and grand larceny must be reversed based on the improper admission of the hearsay statement. As to those counts, the admission of the hearsay statement without a limiting instruction was harmless error. The evidence regarding these counts relating to the taking of property was overwhelming,

---

[3]96 Nev. 742, 751, 616 P.2d 388, 394 (1980).

[4]*Petrocelli v. State,* 101 Nev. 46, 52, 692 P.2d 503, 508 (1985).

in contrast to the evidence on the homicide counts. Furthermore, the hearsay statement related strictly to a homicide, not theft.

MAUPIN, J., with whom LEAVITT, J., agrees, dissenting:

I would affirm the judgments of conviction entered below against appellants on all counts.

## I. *Severance of charges*

The majority holds that the district court abused its discretion by failing to sever the ''Casey'' counts against Tabish from those filed against appellants in connection with the murder of Lonnie Theodore Binion. I disagree.

A district court's decision to join charges is governed by NRS 173.115.[1] '' 'The decision to sever is left to the discretion of the trial court, and an appellant has the ''heavy burden'' of showing that the court abused its discretion.' ''[2] Errors arising from misjoinder are subject to a harmless error analysis and we will reverse ''*only* if the error has a 'substantial and injurious effect or influence in determining the jury's verdict.' ''[3]

### A. *Factual predicate supporting joinder*

The district court in my view properly refused to sever the ''Casey'' charges from the ''Silver'' and ''Binion'' charges because the factual underpinnings of both supported the State's theory that appellants engaged in a common scheme or plan to kill Theodore Binion for monetary gain. Substantial evidence in the record in aid of all three sets of charges suggests that these appellants harbored individual and joint motivations for the fatal attack on Binion.

Proofs generated in support of the Casey charges against Tabish revealed the circumstances surrounding Tabish's takeover of the Jean Sand Pit, a marginally funded financial endeavor with the potential for profits in the millions of dollars. The attempts at acquiring and operating the pit described by trial witnesses demonstrated Tabish's dire financial circumstances and his need for

---

[1]NRS 173.115 provides:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are:
> 1. Based on the same act or transaction; or
> 2. Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

[2]*Honeycutt v. State,* 118 Nev. 660, 667, 56 P.3d 362, 367 (2002) (quoting *Middleton v. State,* 114 Nev. 1089, 1108, 968 P.2d 296, 309 (1998)).

[3]*Robins v. State,* 106 Nev. 611, 619, 798 P.2d 558, 564 (1990) (quoting *Mitchell v. State,* 105 Nev. 735, 739, 782 P.2d 1340, 1343 (1989) (quoting *United States v. Lane,* 474 U.S. 438, 450 (1986))).

substantial sums of money that he did not have available for an investment of that magnitude. A fair reading of the evidence supports the State's theory that his goal was to acquire Binion's stockpile of silver bars, worth approximately $8 million, and that Murphy, whose relationship with Theodore Binion had deteriorated and was possibly ending, harbored images of marriage to Tabish. Trial evidence also strongly suggests that she joined with him in the enterprise to murder Binion to preserve and secure testamentary gifts of the Binion residence and $300,000 in cash assets, as well as substantial proceeds from a life insurance policy on the life of Theodore Binion. The jury was thus entitled to conclude that Tabish needed financing for the sand pit enterprise, that Murphy wanted to preserve her financial well-being via Binion's last will and testament because her relationship with Binion was about to end, that both Tabish and Murphy sought to come out of the scheme as a couple, and that none of this could be successfully accomplished with Binion alive. Certainly, the State was permitted the inference that Tabish's illicit relationship with Murphy facilitated her complicity in this murder.

The State's evidence also creates a fair inference that, for all of Murphy's developed ill will towards Binion, she never would have been able to murder him on her own without Tabish's direct assistance. Therefore, although the joined charges involved separate victims and separate alleged violations of the State criminal code, the evidence generated in support of all three sets of charges suggests a consolidated plan to secure substantial portions of Binion's personal wealth.

I recognize that other trial evidence supported the defense theory that other avenues were available to Tabish, short of murder, to exploit his commercial interests in the sand pit. For example, at least one witness indicated that Tabish's trucking business and the Jean Sand Pit were viable although financially strapped. This was certainly a permissible inference from the evidence that undermined a portion of the State's overall case based upon the "Casey" counts. However, the totality of the evidence introduced at trial entitled the jury to reject the defense evidence and conclude that the pit was part of the scenario that motivated appellants to commit murder.

To me, joinder of the Casey and Binion charges provided an explanation as to why Tabish chose to kill Binion, instead of merely running off with Murphy. Had such an elopement occurred, Tabish would have been forced to forego his attempt to appropriate Binion's silver; and Murphy would have forfeited the lifestyle she enjoyed with Theodore Binion, as well as a substantial portion of the bequests in his last will and testament.

## B. *Cross-admissibility*

Joinder of criminal counts is permissible in situations where the evidence in one count is cross-admissible between counts.[4] In light of the above, I am of the view that the Casey evidence was admissible as evidence of motive under NRS 48.045(2),[5] against both appellants with regard to the remaining counts.

As noted by the majority, admissibility under NRS 48.045(2) of other "bad acts" as non-character evidence, *i.e.,* to demonstrate motive, must be analyzed under our decision in *Tinch v. State.*[6] In *Tinch,* prior bad act evidence of motive must be tested under a three-pronged determination that "(1) the incident is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."[7] Although determining that the Casey evidence was at least marginally relevant and was proved by clear and convincing evidence, the majority concludes that the probative value of the evidence on the issue of motive was limited and thus substantially outweighed by the danger of unfair prejudice.

In my view, ample evidence was generated at trial demonstrating the intertwined motives of these appellants, centering around their desires to join as a couple and effect their joint financial security via Binion's wealth and the economic potential of the sand pit operation. Thus, I have concluded that the probative value of the Casey evidence was substantial and not outweighed in any respect by a potential for unfair prejudice.

## C. *Prejudicial joinder*

As indicated, both appellants argue that the refusal to sever the Casey and Binion counts mandates reversal. Murphy argues additionally that the case against her should have been tried separately.

In certain situations, joinder of charges or defendants, although proper, may result in prejudice to the defendants.[8] However, as also

---

[4]*See Mitchell,* 105 Nev. at 738, 782 P.2d at 1342.

[5]NRS 48.045(2) states in part:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[6]113 Nev. 1170, 1176, 946 P.2d 1061, 1064-65 (1997).

[7]*Id.*

[8]NRS 174.165 states in part:

1. If it appears that a defendant or the State of Nevada is prejudiced by a joinder of offenses or of defendants in an indictment or information,

noted, joinder of offenses in a single indictment or information is allowed under NRS 173.115, where the charges are based upon connected acts or transactions or acts or transactions constituting parts of a common scheme or plan. "To require severance [of separate counts], the defendant must demonstrate that a joint trial would be 'manifestly prejudicial.' "[9] Also, the district court may generally reduce the risk of prejudice to joined defendants through a limiting instruction.[10] Consequently, "the ultimate issue [concerning joined defendants] is 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to [the] separate defendants.' "[11] Therefore, the district court is not required to grant severance of charges or defendants based solely on a defense theory of "guilt by association."[12]

The majority concludes that the refusal to sever the Casey and Binion counts requires reversal in light of the State's closing arguments intertwining the Casey and Binion evidence, the lack of probative value of the Casey evidence on the question of motive, and the graphic nature of the Casey evidence. I disagree.

First, as noted above, I am of the view that the Casey evidence was admissible on the issue of motive as to both defendants and that, accordingly, joinder of the Casey counts as to Tabish had no prejudicial effect on either appellant.

Second, as to Murphy, the district court repeatedly instructed the jury that it could not in any way consider the evidence in support of the Casey counts in determining Murphy's guilt in connection with the Binion-related counts. Here, the majority adopts Murphy's argument that the State's intertwining of the evidence supporting both sets of charges "guarantee[d]" that the jury would violate the admonition. In my view, because the State should have been free to intertwine the two sets of counts in terms of arguing motive and common scheme, the cautionary instruction was actually overly broad in its attempts to protect Murphy. To me, the admonitions should have been narrower in scope, advising the jury that the Casey evidence was relevant only to the issues of common scheme and motive. Thus, Murphy obtained a particular benefit to which

---

or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

[9]*Honeycutt,* 118 Nev. at 667-68, 56 P.3d at 367 (quoting *United States v. Bronco,* 597 F.2d 1300, 1302 (9th Cir. 1979)).

[10]*Lisle v. State,* 113 Nev. 679, 689, 941 P.2d 459, 466 (1997) ("Any possible prejudice may be cured by providing an adequate jury instruction to prevent the jury from associating evidence admissible for one defendant with the other defendant."), *overruled on other grounds by Middleton,* 114 Nev. 1089, 968 P.2d 296.

[11]*Id.* (quoting *Jones v. State,* 111 Nev. 848, 854, 899 P.2d 544, 547 (1995)).

[12]*Id.*

she was not entitled, a cautionary instruction that excluded *any* consideration of the Casey evidence against her.

In any event, I believe that the Casey evidence was admissible against both appellants with regard to the Binion and Silver charges. Thus, I am of the view that the district court committed no error with regard to its cautionary instruction in connection to Murphy and that the State properly attempted to intertwine the three sets of criminal charges as to both appellants.

### D.. *Judicial economy*

When determining whether a district court abused its discretion in deciding issues of joinder, this court " 'must consider not only the possible prejudice to the defendant but also the possible prejudice to the Government resulting from two time-consuming, expensive and duplicitous trials.' "[13] The majority concludes that the other Casey defendants were granted separate trials, and thus, the district court should have granted appellants' motions for the same relief. Several factors contained in the record undermine this conclusion.

First, none of the defendants in these other actions were romantically involved with Murphy. Second, none of the other Casey defendants had a motive to kill Binion. Third, none of these other defendants stood to gain anything from Binion's death. Lastly, there is no evidence that the other Casey defendants conspired with Tabish and Murphy to murder Binion.[14]

### II. *Criminal agency*

I agree with the majority that the State provided sufficient proof at trial of criminal agency as the cause of Binion's death. I take this opportunity to expand upon the majority analysis.

As noted by the majority, to establish corpus delicti, " 'two elements must be established (1) the fact of death; and (2) the criminal agency of another responsible for that death.' "[15] Corpus delicti may be established by "purely direct evidence, partly direct and partly circumstantial evidence, or entirely circumstantial evidence."[16] At the time of trial, "the presence or existence of the corpus delicti is a question for the jury."[17]

---

[13]*Lisle,* 113 Nev. at 688-89, 941 P.2d at 466 (quoting *United States v. Andreadis,* 238 F. Supp. 800, 802 (E.D.N.Y. 1965)).

[14]In line with my conclusions that no error occurred from the district court's refusal to sever the Casey and Binion-related charges, I agree with the majority that appellants should be tried together on remand and that the Casey counts against Tabish be affirmed.

[15]*Frutiger v. State,* 111 Nev. 1385, 1389, 907 P.2d 158, 160 (1995) (quoting *Azbill v. State,* 84 Nev. 345, 350-51, 440 P.2d 1014, 1017 (1968)).

[16]*Sheriff v. Middleton,* 112 Nev. 956, 962, 921 P.2d 282, 286 (1996).

[17]*Azbill,* 84 Nev. at 352, 440 P.2d at 1018.

In *Sheriff v. Middleton,* we held:

> Although medical evidence as to the cause of death is often critical in establishing that a death occurred by criminal agency, there is no requirement that there be evidence of a specific cause of death. The state is required only to show a hypothesis that death occurred by criminal agency; it is not required to show a hypothesis of a specific cause of death.[18]

Based on our prior holding in *Middleton,* it was not necessary that the State prove the exact cause of Binion's death. The State was only required to prove that the victim's death was directly caused by criminal agency. Although there was conflicting evidence on this issue at trial, competent expert testimony was admitted that supports the jury's implied finding through the guilty verdicts that Binion's death was occasioned by a criminal agency.

The State presented testimony from Chief Medical Examiner for Clark County, Dr. Lary Simms, and forensic pathologist Dr. Michael Baden, who has conducted over 20,000 autopsies. Both Doctors Simms and Baden concluded that Binion's death was caused by criminal agency. Dr. Baden concluded that Binion's death was the result of "burking."[19] Dr. Simms concluded that Binion's death was the result of an overdose of drugs. Appellants introduced their own medical experts to contradict the testimony of Doctors Baden and Simms.

"Where conflicting testimony is presented, the jury determines what weight and credibility to give it,"[20] and "[t]he jury is the sole and exclusive judge of the credibility of the witnesses and the weight to be given their testimonies."[21] Appellants did not object to the admissibility of Doctors Baden's and Simms's testimony, but instead chose the trial tactic of attempting to undermine their credibility before the jury. Thus, the issue at trial was not whether the State provided proof of criminal agency; rather, the issue framed by the parties, including these appellants, was which body of expert evidence was worthy of belief by the jury.

Appellants rely heavily on *Azbill v. State*[22] in support of their argument that the State presented insufficient proof of corpus delecti. In *Azbill,* the State proffered a theory of criminal agency that the

[18]112 Nev. at 962, 921 P.2d at 286.

[19]The term "burking" was named after William Burke, who along with an accomplice in 1815, killed a number of people and sold their bodies to medical schools in Edinburgh, Scotland. Burke and his accomplice would follow and kill intoxicated individuals by one of them holding a hand over the victim's nose and mouth, while the other would sit on the victim's chest until he or she died of asphyxia.

[20]*Braunstein v. State,* 118 Nev. 68, 79, 40 P.3d 413, 421 (2002).

[21]*Dorsey v. State,* 96 Nev. 951, 954, 620 P.2d 1261, 1263 (1980).

[22]84 Nev. 345, 440 P.2d 1014.

defendant, Azbill, disabled the decedent, his wife, by starvation and administration of a mixture of drugs and alcohol, and then killed her by setting fire to her bed. Although an eyewitness saw Azbill start the fire that engulfed his wife, the State introduced evidence from two qualified pathologists, both of whom concluded that the decedent died prior to the fire, most likely from the synergistic effects of alcohol and barbiturates. Neither could affirmatively opine that a criminal agency caused Mrs. Azbill's demise.[23] The *Azbill* court noted that Azbill's attempt to burn the body may have been circumstantial evidence of criminal agency; but that the introduction of expert testimony to the contrary by the State factually "closed the door" on the theory of death by fire. Further, in *Azbill,* the State also eliminated the hypothesis that Azbill simply provided a lethal dose of alcohol and drugs to his wife by indicating at oral argument before this court that it did not rely on such a theory of criminal agency. Thus, the only evidence of criminal agency relied upon by the State in *Azbill* was renounced by its own witnesses; and no other theory was offered for consideration by this court.[24]

Here, as indicated, the State introduced competent expert testimony that Theodore Binion died as a result of a criminal agency. Thus, *Azbill* provides no sustenance to appellants' claims in these proceedings.[25]

### III. *Hearsay statement*

At trial, the district court allowed the State to elicit a hearsay statement allegedly made by Binion to his estate attorney, James Brown, Esq., during a phone conversation the day before his death: "Take Sandy [Murphy] out of the will if she doesn't kill me tonight. If I'm dead, you'll know what happened." The statement was admitted by the district court under NRS 51.105(1):

> A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health, is not inadmissible under the hearsay rule.

In *Shults v. State,*[26] we concluded that evidence should only be admitted under this state of mind exception if relevant, after a weighing of probative value versus prejudice, and with an instruction outlining its limited probative value.

---

[23]*Id.* at 353, 440 P.2d at 1019.

[24]*Id.*

[25]I agree with the majority that the district court correctly instructed the jury that it need not reach unanimity on the mode of criminal agency in order to convict appellants on the charges lodged in connection with the murder of Binion.

[26]96 Nev. 742, 751, 616 P.2d 388, 394 (1980).

Appellants placed Binion's state of mind in issue when they contended at trial that he may have been suicidal or accidentally killed himself through a drug overdose. The Binion hearsay statement thus took on considerable importance and was highly probative to refute the alternative theories concerning cause of death proffered by the defense. There was no question that the evidence was admissible, but only for non-hearsay purposes—to prove state of mind—a lack of suicidal ideation; not as proof of an "accusation from the grave." Thus, admission under the state of mind exception does not provide a general license to argue the truth of the content of the statement; again, it is simply admissible for non-hearsay purposes.[27] Accordingly, although agreeing that Binion's hearsay statement was admissible under NRS 51.105(1), the majority concludes that the district court abused its discretion by failing to give the jury a limiting instruction concerning the statement to his attorney, and that failure to give the instruction requires reversal. I disagree.

### A. *Preservation of error for appeal*

At the outset, I would observe that the record is somewhat muddled as to whether the defense perfected and preserved its objections concerning admission of the statement, its use by the State in closing argument, and the failure of the district court to give the limiting instruction under *Shults*. Thus, a brief statement of the procedural history of the litigation of this issue is in order.

Appellants first submitted written briefs on the admissibility of Brown's statement, in which they essentially conceded admissibility under the "state of mind" exception, but requested a limiting instruction concerning its probative value. The parties also orally argued the issue in limine on two occasions, once during jury selection and again before opening statements.

At the first oral argument, defense counsel again agreed that the statement was perhaps admissible under the so-called "state of mind" exception to the hearsay rule, and again argued that the district court give a limiting instruction admonishing the jury that it could not consider the statement for the truth of its contents. The State, erroneously in my view, argued that the probative value of Brown's statement was not so limited and that the jury should be allowed to consider the statement for the proof of the matters asserted in the statement. Rather than give a final determination on the question of admissibility and the prospect of giving the limiting instruction, the court deferred ruling pending further study.

At the second oral argument on the issue, heard before opening statements, the defense argued that the State be prevented from

---

[27]*See* Fed. R. Evid. 803(3) advisory committee's notes.

mentioning the Brown hearsay statement because it was too early to determine whether the defense case would require its admission. The State reiterated its erroneous position that the statement was admissible for the truth of its content, and the defense reiterated the correct position that the probative value of the evidence was limited and that the court should admonish the jury accordingly. Interestingly, in making a partial ruling at the second hearing, the district court referred to the *Shults* decision, performed a weighing analysis in determining admissibility under NRS 51.105, allowed the State to mention Brown's testimony in its opening statement, but did not further mention or make any orders concerning the issue of whether a limiting instruction should be given at any point. Further, in a subsequent written order, apparently memorializing its ruling on the issue at the second hearing in open court, the district court simply observed, ''The State will be allowed to use the Jim Brown statements which are an exception to the hearsay rule, and found to be admissible evidence.'' No comment regarding a limiting instruction is contained within this written order, prepared by the State for the district court's signature.

At trial, Mr. Brown testified without further objection from the defense and without further request for a limiting instruction. There is likewise nothing in this record reflecting an attempt by the defense during final settlement of jury instructions to obtain a limiting instruction concerning the probative value of the statement.[28] Finally, in this regard, counsel for the State during its summation to the jury, in a rhetorical flourish, referred to the statement and argued the truth of the contents of the hearsay statement, first by quoting it: ''If I'm dead, you'll know what happened,'' and then by stating: ''Truer words were never spoken. Less than twenty-four hours later Ted Binion was murdered in his house.'' Again, the defense interposed no objection or request for a limiting instruction in response to this admittedly improper argument.[29]

It is true that the State erroneously argued in limine that the statement was admissible for more than a limited purpose and improperly argued a much broader probative value of the statement to

---

[28]Trial transcripts confirm that a packet of proposed jury instructions submitted by appellants marked ''A'' through ''Y'' were made part of the record below. However, this packet was not included as part of the record in this appeal. Further, no argument concerning a proposed *Shults* instruction is reflected in the transcript of the proceedings during which jury instructions were settled. Finally, no argument was made in the course of this appeal that the packet of instructions marked ''A'' through ''Y'' contained any reference to a limiting instruction concerning the hearsay statement.

[29]Murphy's counsel conceded at the oral argument on this appeal that Binion's hearsay statement was at least theoretically admissible to demonstrate his state of mind, *i.e.,* that he was not suicidal. He correctly stressed, however, that the State improperly argued the statement for the truth of its content.

the jury. It is also true that the defense correctly advised the court of its obligation to instruct on the limited probative value of the statement, to rebut the claims of accidental death or suicide. And it is also true that the district court failed to properly admonish the jury in this regard. However, under our rules governing preservation of issues for appeal, I conclude that appellants have waived any issues concerning Brown's testimony.

By way of further history, under the procedural doctrine governing trials at the time of the trial of this matter, it was incumbent upon the defense to continue to object to admissibility of the evidence at trial without the required cautionary instruction, and to object to the line of argument proffered by the State in summation. Until our December 2002 decision in *Richmond v. State*,[30] our rule of appellate review was that ''a motion in limine, without a contemporaneous objection during trial, is insufficient to preserve an issue for appeal.''[31] In *Richmond,* we relaxed the preservation rule so that now, an explicit and definitive ruling on a motion in limine prevents the need of the movant to take further action to preserve an appellate record.[32] This new rule should apply to this appeal.

Applying *Richmond,* I first note that the district court definitively ruled that the statement was admissible under NRS 51.105, a ruling with which neither the appellants or the majority take basic issue. However, the district court never made a definitive or explicit ruling as to whether a limiting instruction should be given. Referring to the oral ruling at the second hearing concerning admissibility of the statement:

> The Court finds that the alleged conversation that Jim Brown had with Ted Binion on September 16th, 1998, does fit under the state of mind exception of NRS 51.105. Additionally, under *Shults versus State,* 96 Nev. 742, the Court finds the statements to be a relevant [sic] issue, weighted against the prejudice. The victim's extrajudicial declaration to Mr. Brown that day, of his desire to remove Ms. Murphy from his will, along with his revelation that ''if I am dead, you will know what happened,'' are admissible under the state of mind exception to the hearsay rule, due to its being relevant to a material issue in the case subject to a motion to strike if something comes up down the road,

[30]118 Nev. 924, 59 P.3d 1249 (2002).

[31]*Id.* at 929, 59 P.3d at 1253 (citing *Daly v. State,* 99 Nev. 564, 568, 665 P.2d 798, 801 (1983) (failure to object to admission of evidence at trial previously excluded by the grant of a motion in limine removes error from appellate review); *Rice v. State,* 113 Nev. 1300, 949 P.2d 262 (1997) (same); *Staude v. State,* 112 Nev. 1, 908 P.2d 1373 (1996) (after denial of pretrial motion in limine, appellant must object at trial to preserve issue for appeal)).

[32]*Id.* at 932, 59 P.3d at 1254.

the Court is going to allow that and allow Mr. Roger to indicate that in his opening statement.

This is the last verbal observation of record by the judge in this regard. There is no mention of the issue of the limiting instruction in the court's oral or written orders, much less a definitive or final ruling on the giving of a limiting instruction. Going further, no contemporaneous objections to the testimony or to the rhetorical use of the evidence in the State's summation were forthcoming. Thus, even under the new preservation rule of *Richmond,* appellants' objections to admission of the statement without a limiting instruction and the expansive use of the hearsay statement in summation have been waived. The question then becomes whether the failure to give the limiting instruction compels reversal under a plain error analysis.[33]

## B. *Plain or harmless error*

I would not reverse on a plain error analysis because appellants' failure to object can be defended on tactical grounds. For example, at oral argument before this court, counsel for one of the appellants argued that the statement was actually consistent with a person with suicidal ideations. That is, having been recently advised that his paramour was unfaithful and perhaps was starting a new relationship, the statement that she should be taken out of the will was an indication of severe despondency and that he would not be alive for very long.

Hearsay errors, including a failure to comply with *Shults,* are subject to a harmless error analysis.[34] To me, under any weighing of probative value versus prejudice, the Binion statement was clearly admissible. In my view, notwithstanding the erroneous failure to give a cautionary instruction, and notwithstanding the State's improper use of it at closing argument, it is clear beyond a reasonable doubt that the outcome of the trial was not affected.

It cannot be disputed that, once admitted, this evidence was dramatic and it negatively affected, *i.e.,* prejudiced, the defense position. As stated, however, the district court could only reject admissibility based upon ''unfair'' prejudice. Because the defense

---

[33]*See* NRS 178.602.

[34]*See Rowland v. State,* 118 Nev. 31, 43, 39 P.3d 114, 122 (2002) (citing *Franco v. State,* 109 Nev. 1229, 1237, 866 P.2d 247, 252 (1993) (noting that errors concerning hearsay are subject to a harmless error analysis)); *see also Schoels v. State,* 115 Nev. 33, 35, 975 P.2d 1275, 1276 (1999) (noting that an error is harmless if in absence of the error the outcome would have been same).

Notwithstanding my conclusion that the assignment of error concerning this issue was waived, I have determined to reach the merits of the claim because of the efforts made by the defense concerning this issue and because of the ambiguous nature of the record of the trial judge's ruling under NRS 51.105.

took the position that Binion's demise may have been occasioned accidentally or by suicide, the evidence was clearly admissible. While I recognize that our case authority required the cautionary instruction to reduce the chance of unfair prejudice, the admonition would not have affected the outcome because an overwhelming body of trial evidence supports these convictions.

First, although the evidence concerning criminal agency was in conflict, the State provided a very plausible theory of suffocation as the cause of death. Second, the State introduced a substantial body of circumstantial evidence in support of appellants' complicity in Theodore Binion's death. In general, although appellants never actually "confessed" to murdering Binion, they made numerous statements to witnesses from which guilt could be inferred, which were likewise corroborated by additional witnesses. Also, the financial and personal motives of appellants to conspire together to kill Binion certainly augmented the case against them.

More specifically, witnesses testified to appellants' suspicious conduct, including Murphy's discharge of the maid on the day of Binion's demise, the unusual closure of window draperies at the Binion residence that day, absence of valuables from the premises before police took control of the residence as a crime scene, and marked differences in the almost incessant phone activity between appellants on the day of Binion's demise.

Also, a substantial body of evidence was introduced confirming Tabish's severe financial problems, including previously defaulted debts totaling hundreds of thousands of dollars, a $200,000 note to Bank West due for payment on September 18, 1998, and federal tax obligations approximating $1 million, all of which motivated the theft of Binion's silver bars. Witnesses provided evidence of Tabish's discussions with third parties concerning plans to kill Binion; particularly, solicitations of witness Kurt Gratzer to come from Montana to Las Vegas to kill a heroin addict who was dating an ecdysiast. Although subject to attacks on his own credibility, Casey testified that Tabish bragged about an illicit relationship with Murphy, that he was using her to get at Binion's valuable silver collection, and that he was going to accomplish his goals by "pump[ing] him [Binion] full of these drugs."

As to Murphy, uncontradicted evidence demonstrated her virtual total economic dependence on Binion and her desire to maintain her newly acquired lifestyle despite her deteriorated relationship with him. Murphy was substantially motivated to kill Binion because the relationship was about to end, thus compromising her perceived status as a beneficiary under Binion's will and life insurance policy. The rendezvous between Murphy and Tabish in Beverly Hills, California, shortly before Binion's death confirms her hopes to join Tabish in a new relationship, the economic via-

bility of which was dependent upon Tabish obtaining Binion's collection of silver and Murphy's inheritance of a substantial portion of his estate.

The State also bolstered its case as follows. First, witnesses testified to Murphy's questionable statements to third parties prior to Binion's death that Binion would be dead in a few weeks from an overdose and she would be left with nothing. Second, a videotape of Murphy at the Binion residence showed her secreting a wine glass in her purse at a time when investigators were concerned as to whether a mixture of prescription drugs and heroin poisoned Binion. Third, Tabish gave a preposterous story to law enforcement about his presence at the Pahrump Valley vault and made inconsistent statements to Nye County law enforcement at the scene of the vault about the presence of the silver bars in his truck. Finally, Tabish's instructions to witnesses after his incarceration concerning prospective testimony, along with the promise of financial rewards, abundantly demonstrated his consciousness of guilt.

Thus, given proof of criminal agency, the State produced substantial rebuttal to the defense claims that Binion committed suicide. As pointed out by the State, it seems a wholly unlikely coincidence that Binion killed himself as he was ending the relationship; on the last day that appellants could gain access to his wealth; at a time when he was making plans to restore his gaming license, invest in real property and become involved in a statewide political race via a substantial monetary contribution to a major gubernatorial candidate; and, most tellingly, on the very last day before Tabish's $200,000 debt to Bank West was due.

### CONCLUSION

First, the State elicited competent evidence establishing criminal agency. Second, severance was not required because the evidence in support of the Casey counts against Tabish was admissible on the issue of common scheme and motive against both appellants in connection with the Binion charges. Third, because of a substantial body of evidence in support of the guilt of both appellants, the failure to give a limiting instruction with regard to Binion's hearsay statement did not affect the outcome of the trial.

I again recognize that the parties below provided the jury with conflicting evidence bearing on the guilt or innocence of these appellants. However, the trial record supports the State's theory that a helpless benefactor was the victim of a pitiless attack by a pair of mercenary opportunists. It is also apparent that the financial am-

bitions of these appellants far exceeded their capabilities, thus providing a motive for taking what they could not obtain through their own individual or joint resources.

In light of the above, I would affirm the judgments of conviction.[35]

---

[35]I take this opportunity to separately comment upon appellants' claim that jury misconduct requires reversal for a new trial. To me, the claims that the jury applied an improper standard for guilt, *i.e.,* depraved indifference, and a theory of guilt by omission, *i.e.,* that the defendants did nothing to aid Theodore Binion as he lay dying, improperly require us to delve into the thought processes of the jurors in violation of NRS 50.065(2). As to the claims of juror misconduct in connection with the use of a palm pilot computer, this improper action did not, in my view, affect the jury's verdict.

Although I have not provided an analysis of the remaining claims of error, given the overwhelming evidence of guilt of these appellants, I have concluded that the remaining claims do not compel reversal.