133 Nev., Advance Opinion 86

# IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| STEVEN DALE FARMER,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 65935<br><br>**FILED**<br>NOV 16 2017<br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY<br>CHIEF DEPUTY CLERK |

Appeal from a judgment of conviction, pursuant to a jury verdict, of four counts of sexual assault, eight counts of open or gross lewdness, and one count of indecent exposure. Eighth Judicial District Court, Clark County; Carolyn Ellsworth, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and Ryan J. Bashor and Deborah L. Westbrook, Deputy Public Defenders, Clark County, for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Brian J. Kochevar, Deputy District Attorney, Clark County, for Respondent.

BEFORE THE COURT EN BANC.

 

17-39489

*OPINION*

By the Court, PICKERING, J.:

Appellant Steven Farmer was charged with numerous sexual offenses based on accusations that he used his position as a certified nursing assistant (CNA) to take advantage of multiple patients in his care. The State of Nevada argued that Farmer should face five of his accusers in one trial, and Farmer argued in favor of separate trials. After a hearing on the matter, the trial court granted the State's motion to join the offenses under the theory that they were committed pursuant to a common scheme or plan according to NRS 173.115(2). In this appeal, Farmer argues that this court has construed the common scheme or plan language to permit joinder only where the defendant had an overarching plan which involved committing each offense as an individual step toward a predetermined goal, and since his offenses were crimes of opportunity, the trial court erred by joining them. We disagree with his arguments and conclude that the court properly joined the offenses in a single trial. Because we further conclude that his remaining claims lack merit, we affirm the judgment of conviction.

I.

Five female patients who were treated at Centennial Hills Hospital over a two-month period in 2008 testified that Farmer, a CNA employed by the hospital, touched them in a sexual manner. The first patient, L.S.,[1] was taken by ambulance to Centennial Hills in April 2008, following a suicide attempt. She was introduced to Farmer the next day. While she sat in her hospital bed waiting to be moved to a mental health

---

[1]The parties amended their respective briefs to refer to Farmers' victims by their initials, and we do so as well for the purposes of this opinion.

facility, Farmer chatted with L.S. and pushed his groin against her foot. L.S. tried to move away but Farmer continued to push his groin into her while smirking. L.S. and her aunts, who were also in the room, discussed the incident afterward but did not report it to the hospital or to law enforcement at the time.

About two weeks later, M.P. was taken by ambulance to Centennial Hills after experiencing a seizure that left her unable to speak or move. While recovering, M.P. awoke to find Farmer pinching and rubbing her nipples. When Farmer realized M.P. was awake, he told her that one of the leads of her electrocardiogram (ECG) machine had come off. Later, he lifted M.P.'s hospital gown and peered at her exposed body. He then informed M.P. that she had fecal matter on her underside, lifted her legs, and stuck his thumb in her rectum. After that, he penetrated her vagina with his fingers, explaining that he was checking her catheter. When she regained the ability to speak, M.P. told her sons that Farmer had touched her inappropriately, but she did not report the incident to the hospital or to law enforcement at the time.

A few days later, H.S. was taken by ambulance to Centennial Hills following a seizure. Farmer, who was assigned to transport H.S. to her room, told her when they were alone in an elevator that he should remove the ECG leads. As she lay on the gurney, Farmer opened H.S.'s hospital gown and exposed her breasts. He then removed the leads from her chest, grazing her breast, but did not remove the other leads from her body. Feeling uncomfortable about the situation, H.S. closed her gown and Farmer nervously laughed. Later, Farmer told H.S.'s husband that the ECG leads were tangled in her blanket. Without adjusting the blanket, Farmer exposed and began touching H.S.'s breasts. Her husband covered

Supreme Court
OF
Nevada

(O) 1947A

3

her and asked Farmer why he had not been more modest. Farmer quickly left the room. H.S. and her husband did not discuss the incidents until later and did not report them at the time.

The same day, R.C. was taken by ambulance to Centennial Hills following a seizure. Farmer was assigned to transport her to her room. Once they were alone in an elevator, Farmer reached underneath R.C.'s blanket and rubbed her thigh. Farmer told R.C. that the medications administered by the hospital would take effect and she would fall asleep. After transporting R.C. to her room, Farmer repeatedly told her that she needed to relax. He then penetrated her vagina with his fingers, explaining that it was procedure and would help her rest. He also squeezed R.C.'s breasts and, according to R.C., performed cunnilingus. Afterwards, Farmer told the nurses assigned to R.C. that they did not need to check on her because she was highly medicated and would not know whether they visited. R.C. reported the incident to the hospital and police, leading to an investigation.

The next day, D.H. was transported by ambulance to Centennial Hills after experiencing chest pains and shortness of breath. While her nurse was out of the room, Farmer walked in, announced that he was there to check on her, then opened D.H.'s hospital gown and exposed her breasts. Farmer touched the ECG leads on D.H.'s abdomen and chest, grazing her breast, but did not touch the remaining leads. D.H. felt uncomfortable because there was no apparent need for Farmer to be in the room or to expose her breasts, but she did not report the incident at the time. D.H.'s nurse, who had witnessed the incident, reported Farmer's conduct.

R.C. was the first patient to report that Farmer had touched her sexually. After law enforcement issued a media release, L.S., M.P., H.S., and D.H. came forward. At trial, each woman testified about Farmer's actions,[2] and other witnesses, including a witness offered by the defense, testified about Farmer's unusual behavior, corroborating portions of the victims' testimonies. Farmer was convicted by a jury of four counts of sexual assault, eight counts of open or gross lewdness, and one count of indecent exposure, and was sentenced to three consecutive terms of life imprisonment with the possibility of parole after ten years, as well as other concurrent sentences.[3] This appeal followed.

## II.

Farmer's main contention on appeal, which is the focus of this opinion, is that the trial court abused its discretion by granting the State's motion to join the offenses alleged by L.S., M.P., H.S., R.C., and D.H., and by denying his motion to sever the charges. He argues that the reasoning behind the trial court's decision—that the offenses were parts of a common scheme or plan—was erroneous because the State did not show that each offense was an integral part of an overarching criminal enterprise. The State counters by pointing to the striking similarities between the offenses, which it argues demonstrate that they were committed pursuant to design as opposed to being crimes of opportunity. Both parties cite authority in support of their positions, revealing some tension in our joinder jurisprudence.

---

[2]M.P. passed away before trial but a previously recorded deposition was played for the jury in lieu of live testimony.

[3]Farmer was found not guilty of an indecent exposure charge regarding H.S. and one sexual assault charge regarding R.C.

A.

NRS 173.115 provides that separate offenses may be joined if they are (1) "[b]ased on the same act or transaction" or (2) "[b]ased on two or more acts or transactions connected together or constituting parts of a common scheme or plan."[4] An examination of this court's jurisprudence applying NRS 173.115(2) reveals that, historically, this court has focused on whether the offenses shared certain elements in common when determining whether they were properly joined, at least insofar as those similarities were striking enough to suggest that the offenses were committed as part of a scheme or plan. In *Mitchell v. State*, for example, we held that the trial court erred by joining charges arising from two separate incidents, 45 days apart, where the defendant sexually assaulted women after taking them to the same bar. 105 Nev. 735, 738, 782 P.2d 1340, 1342 (1989). In doing so, we noted that there were some minor similarities between the two incidents, but not enough to suggest that the incidents were committed pursuant to design: "[T]aking two different women dancing and later attempting intercourse [cannot] be considered part of a common plan just because the women are taken in part to the same bar." *Id.* But in *Shannon v. State*, we held that the trial court appropriately joined charges arising out of two separate incidents where the defendant met his young victims, both of the same age group, through his role as leader of a canoe club, placed himself in a position of trust over them, then committed sexual acts on them while on canoe trips. 105 Nev. 782, 786, 783 P.2d 942, 944 (1989). In upholding that decision, we stated that "[g]iven the closeness of

---

[4]The 2017 amendments to NRS 173.115 are not relevant to our discussion. A.B. 412, 79th Leg. (Nev. 2017).

Supreme Court
OF
Nevada

(O) 1947A

the acts, the similar circumstances, and the same modus operandi, the criterion of a common scheme or plan was sufficiently satisfied." *Id.* We used the same analysis in other cases, conducting a fact-specific inquiry comparing the offenses to be joined and discussing whether there were sufficient connections to give rise to the inference that the offenses were committed pursuant to a common scheme or plan rather than unrelated crimes of the same ilk. *E.g., Middleton v. State*, 114 Nev. 1089, 1107, 968 P.2d 296, 308-09 (1998); *Tillema v. State*, 112 Nev. 266, 269, 914 P.2d 605, 607 (1996); *Graves v. State*, 112 Nev. 118, 128, 912 P.2d 234, 240 (1996); *Griego v. State*, 111 Nev. 444, 449, 893 P.2d 995, 999 (1995), *abrogated on other grounds by Koerschner v. State*, 116 Nev. 1111, 13 P.3d 451 (2000).

Although our analyses focused on whether the joined offenses shared features in common, we were *not always* clear regarding which portion of NRS 173.115(2) we were relying upon in reaching our decisions. *See, e.g., State v. Boueri*, 99 Nev. 790, 796, 672 P.2d 33, 37 (1983). In *Weber v. State*, this court took its first real stab at providing guidance regarding the phrase "connected together or constituting parts of a common scheme or plan." 121 Nev. 554, 571-73, 119 P.3d 107, 119-20 (2005). Looking to our prior cases, we held that offenses were "connected together" when evidence of the offenses would be cross-admissible at separate trials, a consideration that had always floated around in our prior decisions but had not been moored to any particular language in the joinder statute. *Id.* at 573, 119 P.3d at 120. We also defined the words "scheme" and "plan" for the first time. *Id.* at 572, 119 P.3d at 119-20. Looking to Black's Law Dictionary, we defined scheme as "a design or plan formed to accomplish some purpose; a system," and plan as "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object. Method of

putting into effect an intention or proposal." *Id.* (internal quotation marks omitted). We then considered the facts of that case in the context of those definitions and held that the offenses were connected together but were not adequately shown to have been parts of a common scheme or plan. *Id.* at 573, 119 P.3d at 120.

### B.

Farmer argues that *Weber* changed the joinder calculus. Specifically, he argues that *Weber* eliminated any consideration of whether the offenses to be joined share sufficient similarities and refocused the analysis on whether each offense was a pre-planned step up the ladder toward a specific, predetermined goal. Farmer reads *Weber* too narrowly. Nothing in *Weber* (or the prior-bad-acts line of cases upon which he also relies) indicates an intent to overrule decades of this court's joinder jurisprudence. We recognize, however, that *Weber*'s definitions of "scheme" and "plan" arguably leave little room for the broader similarity analysis that we have historically employed in joinder cases. Nothing about those definitions is facially wrong, and *Weber*'s holding was correct based on the facts of that case. But *Weber* construed the words "scheme" and "plan" as synonyms. Defining different words, separated by the conjunction "or," to mean the same thing is incorrect under the canons of statutory interpretation. *Colautti v. Franklin*, 439 U.S. 379, 392 (1979), *overruled in part on other grounds by Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989). And interpreting "scheme" and "plan" as having nearly identical meanings ignored the common usage of the words in the evidentiary context. *See generally* David. P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 9.2.2 (2009).

Contrary to our discussion in *Weber*, the words "scheme" and "plan" as used in NRS 173.115(2) have different implications and ground different theories of joinder. Instead of reading NRS 173.115(2)'s "parts of a common scheme or plan" language as one phrase with one meaning, NRS 173.115(2) is properly understood as permitting joinder if the offenses are "parts of a common scheme" *or* "parts of a common plan." And "the terms 'common scheme' and 'common plan' are not synonymous." *Scott v. Commonwealth*, 651 S.E.2d 630, 635 (Va. 2007). In the joinder context, "the term 'common plan' describes crimes that are related to one another for the purpose of accomplishing a particular goal." *Id.* In contrast, "[t]he term 'common scheme' describes crimes that share features idiosyncratic in character." *Id.*

Thus, in addition to rejecting any reading of *Weber* that would suggest a narrowing of our decisions, we clarify that the similarity analysis in our prior decisions derives from NRS 173.115(2)'s language that offenses may be joined when they are committed as parts of a common scheme.[5]

___

[5]Farmer also points to a line of cases discussing the admission of bad acts pursuant to NRS 48.045(2). While we do not discount the notion that cases interpreting the terms "scheme" and "plan" in the bad-acts context can be considered when interpreting the terms in the joinder context (as we do throughout this opinion), Farmer's reliance on this particular line of cases is misguided. NRS 48.045(2) states that evidence of bad acts may be admissible as proof of "plan"—not "common scheme or plan"—and the bad-acts line of cases tend to direct back to *Nester v. State*, which referred to the common law rule that evidence of bad acts was admissible to establish "a common scheme or plan *embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others.*" 75 Nev. 41, 46, 334 P.2d 524, 527 (1959) (emphasis added), *abrogated on other grounds by Bigpond v. State*, 128 Nev. 108, 270 P.3d 1244 (2012). And, like *Weber*, they do not separately discuss common scheme.

While there may be valid reasons to limit the circumstances in which different offenses may be joined,[6] defining the "common scheme" theory of joinder as we do is not only consistent with its understanding in the evidentiary context, giving independent meaning to the word "scheme" where there otherwise would be none, it is consistent with our well-settled understanding of NRS 173.115(2) and the traditional understanding of joinder generally. *See* Clifford S. Fishman & Ann T. McKenna, *Jones on Evidence: Civil and Criminal* § 17:17 (7th ed. Supp. 2016) ("Separate crimes committed with a similar, unusual modus operandi, or with sufficient similar characteristics, also may be joined for trial.").

## C.

We now turn to the question of whether joinder was appropriate in this case. For the purposes of this opinion, we focus on whether the various offenses were shown to have been parts of a common scheme.[7] As our prior decisions demonstrate, the fact that separate offenses share some trivial elements is an insufficient ground to permit joinder as parts of a common scheme. *See, e.g., Mitchell*, 105 Nev. at 738, 782 P.2d at 1342.

---

[6]The federal joinder rule, which provides that offenses can be joined when they are merely of "the same or similar character," even if those similarities are insufficient to give rise to the inference that they were committed pursuant to a common scheme or plan, has been criticized for allowing the jury to make improper character inferences. Kevin P. Hein, *Joinder and Severance*, 30 Am. Crim. L. Rev. 1139, 1149 (1993) (internal quotation marks omitted); James Farrin, *Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice*, 52 Law & Contemp. Probs. 325, 331 (1989).

[7]We also agree with the State's argument that joinder was permissible because the offenses were connected together under *Weber.*

Supreme Court
OF
Nevada

(O) 1947A

10

Instead, when determining whether a common scheme exists, courts ask whether the offenses share such a concurrence of common features as to support the inference that they were committed pursuant to a common design. *State v. Lough*, 889 P.2d 487, 494 (Wash. 1995). Features that this court has deemed relevant to this analysis include (1) degree of similarity of offenses, *Tabish v. State*, 119 Nev. 293, 303, 72 P.3d 584, 591 (2003); (2) degree of similarity of victims, *id.* at 303, 72 P.3d at 590; (3) temporal proximity, *Mitchell*, 105 Nev. at 738, 782 P.2d at 1342; (4) physical proximity, *Griego*, 111 Nev. at 449, 893 P.2d at 999; (5) number of victims, *id.*; and (6) other context-specific features.[8] No one fact is dispositive, and each may be assessed different weight depending on the circumstances. *Weber*, 121 Nev. at 572, 119 P.3d at 119 ("Determining whether a common scheme or plan existed in this, or any, case requires fact-specific analysis.").

We have little difficulty concluding that Farmer's offenses were adequately shown to have been parts of a common scheme. The incidents all occurred within the span of several weeks, and all at Centennial Hills Hospital. While the record suggests that the victims' physical attributes varied, the victims were markedly similar in that each was in a profoundly vulnerable state having been taken to Centennial Hills by ambulance after a traumatic medical episode. Of particular relevance, the offenses were not based on one or two incidents widely separated in time, but the allegations of five unrelated victims who claimed that Farmer touched them sexually while suggesting, or outright stating, that the touching was a part of their medical care. To be sure, the various incidents were not identical. But they

---

[8]Other courts have looked to similar facts. *See United States v. Ortiz*, 613 F.3d 550, 557 (5th Cir. 2010); *State v. Elston*, 735 N.W.2d 196, 199 (Iowa 2007); *Commonwealth v. Pillai*, 833 N.E.2d 1160, 1166 (Mass. 2005).

are not required to be. *See State v. Ness*, 707 N.W.2d 676, 688 (Minn. 2006) (recognizing that evidence of other offenses admitted as parts of a common scheme or plan need not be identical but must be markedly similar). And while Farmer's argument that many of these facts were obviously going to be present given that the allegations all stemmed from his role as a CNA is well taken, it does not alter our analysis. To hold under these circumstances that Farmer did not have a scheme to use his position as a CNA to access unusually vulnerable victims and exploit them under the guise of providing medical care would unjustifiably narrow the term, leaving it with little practical effect. Simply put, "these counts involve too many similar factors when viewed together, to be anything but clearly linked and part of the same common scheme or plan." *Rushing v. State*, 911 So. 2d 526, 536 (Miss. 2005).

### D.

Our joinder analysis is not done yet, because even if offenses are appropriately joined under NRS 173.115 the trial court should order separate trials if it appears that the defendant will be unduly prejudiced. NRS 174.165(1). For separate trials to be required, "'[t]he simultaneous trial of the offenses must render the trial fundamentally unfair, and hence, result in a violation of due process." *Rimer v. State*, 131 Nev., Adv. Op. 36, 351 P.3d 697, 709 (2015) (quoting *Honeycutt v. State*, 118 Nev. 660, 667–68, 56 P.3d 362, 367 (2002), *overruled on other grounds by Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005)). In that regard, Farmer argues that joining all of the offenses was fundamentally unfair because it created too great a risk that the jury would improperly infer that he had the propensity

to commit sexual acts without considering each charge separately. And he argues that the State exacerbated this problem by repeatedly asking the jury to make this exact inference. We disagree.

The State did not argue or suggest that Farmer was a sexual deviant and therefore had the propensity to commit deviant acts. Instead, the State made the logical and appropriate argument that the number of victims, and similarity of their stories, was evidence that the offenses actually occurred as the victims claimed, which was the primary issue in the case. *See* Leonard, *The New Wigmore: A Treatise on Evidence, supra,* § 9.4.2 (noting the "doctrine of chances," which recognizes that sexual molestation charges involving separate victims may be cross-admissible where the defense is the accusations are false or the victims mistaken; cross-admissibility or joinder rests in such cases on the objective "improbability of so many unfounded accusations of sexual molestation being made independently," effectively removing as a plausible explanation the possibility of mistake or accident). The State's argument thus was not an impermissible attack on Farmer's character nor did it unfairly invite the jury to make improper character inferences. *See generally* Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered,* 29 U.C. Davis L. Rev. 355, 407-08 (1996) (discussing evidence involving multiple accusers with similar stories and explaining that "[f]ocusing as it does on the accusers' stories rather than on the accused's conduct, similar accusations evidence

SUPREME COURT
OF
NEVADA

(O) 1947A

13

is easily distinguished from character").[9] Farmer's defense—that R.C. falsely accused him of rape and the other women mistook innocent medical care as sexual after he was branded as a rapist—was not complicated and we are confident that jurors were capable of carefully considering the elements of each offense under the circumstances.

### E.

Even if reasonable minds might differ as to whether joinder was appropriate in this case, we cannot state that the trial court abused its discretion in making its joinder decision under the circumstances described above. *See Rimer*, 131 Nev., Adv. Op. 36, 351 P.3d at 707 (reviewing a trial court's decision regarding a motion to join or sever offenses for an abuse of discretion, viewed at the time the court made its decision). While not central to our decision, we note that the trial court declined to join offenses relating to a sixth victim—F.R.—whom Farmer also met in his role as a CNA, observing that the allegations involving F.R. were further removed in time (they occurred months before the other incidents) and location (they occurred at a psychiatric hospital, not Centennial Hills), and that the circumstances were too dissimilar for other reasons (F.R. dated Farmer thereafter). Our review of the record indicates that the trial judge

---

[9]This determination might have been different had Farmer acknowledged that someone committed the offenses but denied he was the suspect or proffered different defenses in his motion to sever. *See generally People v. Ewoldt*, 867 P.2d 757, 772 (Cal. 1994) (observing that in cases where "it is beyond dispute that the charged offense was committed by someone [and] the primary issue to be determined is whether the defendant was the perpetrator of that crime," evidence that the defendant committed offenses that were markedly similar but insufficient to establish identity may be deemed overly prejudicial), *superseded by statute on other grounds as stated in People v. Britt*, 128 Cal. Rptr. 2d 290 (Ct. App. 2002).

adequately weighed each party's position after considering the relevant law and facts and reached a decision consistent with this court's authority discussing the common scheme theory of joinder under NRS 173.115(2) and misjoinder under NRS 174.165. We hold that there was no abuse of discretion. *See Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001) ("An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason.").

## III.

Farmer also alleges that his rights under Nevada and federal law were violated before trial, during trial, and at sentencing. We consider these arguments in turn.

## A.

Farmer first asserts that the trial court violated his right to a speedy trial under the Sixth Amendment. Courts engage in a four-part balancing test to determine whether a defendant's speedy-trial rights were violated: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992); *Middleton v. State*, 114 Nev. 1089, 1110, 968 P.2d 296, 310 (1998). While the first factor tends to favor Farmer, the second and third factors overwhelmingly weigh against him as almost all of the delay is attributable to the defense and he personally waived his speedy-trial right. And although he argues he was prejudiced because M.P. committed suicide before trial, he had an adequate opportunity to cross-examine her before trial as explained in more detail below. His claim therefore fails.

B.

Next, Farmer asserts that the trial court so unreasonably restricted his cross-examination of R.C., her husband, and H.S.'s nurse, that it violated his right to confrontation. We review a trial court's evidentiary rulings for an abuse of discretion and the ultimate question of whether a defendant's Confrontation Clause rights were violated de novo. *Chavez v. State*, 125 Nev. 328, 339, 213 P.3d 476, 484 (2009). Importantly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Regarding R.C. and her husband, Farmer says that he should have been able to question them about several issues. First, he asserts that he should have been able to ask the couple about problems in their marriage because the State argued that their marriage fell apart due to the sexual assault. Our review of the record, however, indicates that Farmer wanted to bring up allegations made in the couple's divorce proceedings to show that one of them had not told the truth in those proceedings, not the basis he proffers on appeal. *Ford v. Warden*, 111 Nev. 872, 884, 901 P.2d 123, 130 (1995) (recognizing that an appellant generally may not change his theory underlying an assignment of error on appeal). The trial court invited Farmer to raise the matter during trial if the door was opened to specific allegations, but he did not. Second, Farmer asserts that he should have been able to question R.C. about whether her civil attorney had represented her in prior litigation because she stated that he was "just a friend." But R.C. never claimed her attorney was "just" a friend, and it was clear that he

Supreme Court
OF
Nevada

(O) 1947A

16

had represented her in civil cases. Finally, Farmer asserts that he should have been able to question R.C. about her interactions with nurses after the assault. Farmer had already questioned R.C. about these interactions and she repeatedly stated that she did not recall speaking with the nurses. The trial court acted within its authority to restrict further cross-examination on the subject. We discern no abuse of discretion or violation of Farmer's constitutional rights.

Regarding H.S.'s nurse, Farmer argues that he should have been able to ask her about the fact that she was fired from Centennial Hills to demonstrate her bias against the hospital and rebut her testimony that he did not follow proper hospital procedure. However, Farmer was not prohibited from asking the nurse about her firing and the trial court did not abuse its discretion by determining that the reason why she was fired was irrelevant. We discern no abuse of discretion or violation of Farmer's constitutional rights.

Regarding M.P., Farmer argues that the trial court unreasonably restricted his cross-examination during her deposition and violated his right to confrontation by allowing her deposition testimony to be introduced at trial. *See Chavez*, 125 Nev. at 337, 213 P.3d at 483 ("[T]he Confrontation Clause bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'") (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). We discern no abuse of discretion with the trial court's rulings regarding the questions during M.P.'s deposition. As to Farmer's assertion that the introduction of the deposition testimony was improper because he subsequently obtained information about which he was unable to cross-examine M.P., he only

Supreme Court
OF
Nevada

(O) 1947A

17

identifies two areas that he was unable to fully explore. First, he claims he was unable to question M.P. regarding her subsequent suicide. We reject this argument, as it would mean the prior testimony of an unavailable witness could never be given at trial unless the defendant had cross-examined the witness regarding the reasons for her unavailability. Second, he claims he was unable to question M.P. regarding a statement her son made at trial that she avoided male medical professionals after the incident. M.P.'s testimony at the deposition provided an adequate opportunity to explore this area even if it did not directly relate to her son's comment. *See id.* at 338, 213 P.3d at 483 ("the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish") (internal quotation marks omitted).

## C.

Farmer also asserts that the trial court abused its discretion in making several evidentiary decisions. *See Vega v. State*, 126 Nev. 332, 341, 236 P.3d 632, 638 (2010) (recognizing that trial courts have "broad discretion to determine the admissibility of evidence"). First, he asserts that the trial court should have excluded testimony about the psychological effect of his attacks on R.C. and H.S. because it was irrelevant and overly prejudicial. The State argues that this evidence was admissible because it tended to show that the victims were being truthful in their allegations. Regarding R.C., we agree with the State. *See id.* at 342, 236 P.3d at 639 (holding that evidence of the victim's suicide attempt was relevant and not overly prejudicial because "it had a tendency to establish that it is more probable than not that [the defendant] had sexually assaulted the victim");

*see also Dickerson v. Commonwealth*, 174 S.W.3d 451, 472 (Ky. 2005) (permitting introduction of "evidence of a victim's emotional state following a sexual assault as proof that the assault, in fact, occurred" and collecting similar cases).[10] Regarding H.S., we agree with Farmer. Unlike R.C., whose credibility was a key issue, the relevant issue with H.S. and her husband was whether they had mistaken innocent medical care as inappropriate sexual conduct. Thus, this evidence had less probative value than it did for R.C. and was ultimately unfairly prejudicial. However, we conclude that the introduction of this evidence regarding H.S. was harmless under the circumstances.

Second, Farmer argues that the trial court abused its discretion by refusing to admit a portion of a redacted copy of M.P.'s diary, which suggested that personal issues may have led to her suicide, not issues relating to the assault. Farmer fails to demonstrate that the portion of the diary was admissible; his reliance on NRS 47.120 is misplaced because the diary was never introduced and he does not establish a sufficient evidentiary basis to admit it on other grounds.

Third, Farmer argues that the trial court abused its discretion by permitting evidence of two uncharged bad acts without a limiting instruction. *Tavares v. State*, 117 Nev. 725, 732, 30 P.3d 1128, 1132 (2001),

---

[10]We conclude that the trial court did not err by denying Farmer's proposed instruction advising the jury not to consider this evidence. Although Farmer argues on appeal that the testimony went beyond the narrow time parameters established by the trial court, he did not contemporaneously object on this ground or otherwise seek to clarify the time frame, which precludes appellate review of the issue. *See Burgeon v. State*, 102 Nev. 43, 47, 714 P.2d 576, 579 (1986) ("We have consistently held that this Court will not speculate as to the nature and substance of excluded testimony.").

*modified by Mclellan v. State*, 124 Nev. 263, 182 P.3d 106 (2008). He first takes issue with a nurse's testimony that he violated federal rules by discussing R.C.'s condition in front of another patient. We are not convinced that this constitutes a bad act as contemplated by NRS 48.045(2), but in any event, no relief is warranted because Farmer objected to the comment and the State moved on. Next, Farmer challenges admission of a photograph of R.C. that listed Phenobarbital as the "date rape drug." This inadvertently included notation in no way suggested that Farmer had administered the drug to R.C. and does not constitute a bad act. We conclude that no relief is warranted on these claims.

Next, Farmer claims that the State's witnesses inappropriately vouched for one another by making statements regarding the victims' demeanor, describing other witnesses as cooperative or uncooperative, and restating each other's testimony. "A witness may not vouch for the testimony of another or testify as to the truthfulness of another witness." *Perez v. State*, 129 Nev. 850, 861, 313 P.3d 862, 870 (2013). Upon review, we conclude that the challenged testimony does not constitute improper vouching so as to warrant relief.

### D.

Farmer also asserts that the prosecutor committed numerous instances of misconduct. However, he only fairly and contemporaneously objected to one: the prosecutor's argument that a normal person in Farmer's position would have denied committing sexual assault when confronted with the accusation. *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (explaining that harmless error review only applies when prosecutorial misconduct is preserved). The prosecutor's argument was a fair comment on the testimony concerning Farmer's response when a

hospital employee called him and relayed the allegation of sexual abuse. Regarding the unpreserved misconduct, we conclude that Farmer fails to demonstrate plain error that affected his substantial rights. *See id.* (explaining that a defendant must demonstrate plain error regarding unpreserved allegations of prosecutorial misconduct).

## E.

Finally, Farmer contends that his sentence constitutes cruel and unusual punishment. *See* U.S. Const. amend. VIII; Nev. Const. art. 1, § 6. He claims that his sentence shocks the conscience because it essentially condemns him to a life-sentence for actions that did not cause substantial physical harm. We disagree. We also reject Farmer's claim that cumulative error warrants relief. *See Valdez*, 124 Nev. at 1195, 196 P.3d at 481 ("When evaluating a claim of cumulative error, we consider the following factors: (1) whether the issue of guilt is close, (2) the quantity and character of the error, and (3) the gravity of the crime charged.") (internal quotation marks omitted).

As Farmer received the fair trial to which he was entitled, we affirm.

_____, J.
Pickering

We concur:

_____, J.
Douglas

_____, J.
Gibbons

_____, J.
Parraguirre

 

STIGLICH, J., with whom CHERRY, C.J., and HARDESTY, J., agree, dissenting:

The district court denied appellant Steven Farmer's challenge to improper joinder pursuant to NRS 173.115 and denied Farmer's motion to sever for prejudicial joinder pursuant to NRS 174.165. The majority concludes that the charges involving five different victims and involving largely different acts on different days were properly joined as parts of a common scheme and that joinder was not unfairly prejudicial. Respectfully, I dissent from these decisions.

*Improper joinder*

NRS 173.115 allows for the joinder of offenses against a single defendant only when the offenses charged are based on "the same act or transaction" or "two or more acts or transactions connected together or constituting parts of a common scheme or plan." If these conditions are not met, the district court must order separate trials.[1] Judicial economy and

---

[1]It should be noted that the majority of the federal circuits have held that the issue of joinder should be based on a review of the charging documents alone. *See, e.g., United States v. Butler*, 429 F.3d 140, 146 (5th Cir. 2005); *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002); *United States v. Wadena*, 152 F.3d 831, 848 (8th Cir. 1998); *United States v. Coleman*, 22 F.3d 126, 134 (7th Cir. 1994); *United States v. Natenel*, 938 F.2d 302, 306 (1st Cir. 1991); *United States v. Terry*, 911 F.2d 272, 277 (9th Cir. 1990). Here, looking solely at the charging documents, joinder was improper because the State's basis for joinder was not apparent from the charging documents. This issue has not been addressed by the parties, nor has it been clearly addressed in our case law. Thus, like the majority, I have examined the totality of the record before us.

prejudice have no part of the district court's analysis of improper joinder.[2] Although our prior caselaw has suggested that this court will review an improper joinder decision for an abuse of discretion, *see Zana v. State*, 125 Nev. 541, 548, 216 P.3d 244, 249 (2009), the issue of improper joinder is a question of law that should be reviewed de novo, *see Coleman*, 22 F.3d at 134; *Terry*, 911 F.2d at 276. On appeal, the issue of improper joinder is subject to harmless error analysis and the State must demonstrate that the improper joinder did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Mitchell v. State*, 105 Nev. 735, 738-39, 782 P.2d 1340, 1343 (1989); *see also United States v. Lane*, 474 U.S. 438, 449 (1986).

The district court found that the State had demonstrated a common scheme or plan: Farmer used his position as a certified nursing assistant at Centennial Hills Hospital to access and sexually abuse female patients. The majority has affirmed that finding, concluding that the charges involving the five different victims were properly joined as part of a common scheme.[3] However, rather than using the definition for common scheme set forth in *Weber v. State*, "a 'design or plan formed to accomplish some purpose; a system,'" 121 Nev. 554, 572, 119 P.3d 107, 119-20 (2005) (quoting *Black's Law Dictionary* 936 (abr. 6th ed. 1991)), the majority has

---

[2]Rather, these concerns are only properly considered by the district court in the context of prejudicial joinder under NRS 174.165, which assumes that the charges are properly joined.

[3]The majority has further concluded that the offenses were properly joined as "connected together" but provided no analysis for how any of the offenses would be cross-admissible in separate trials. This conclusion appears inappropriate where the district court did not reach this issue and the State inadequately addressed it on appeal.

redefined common scheme to mean similarity, a test implicitly rejected in *Weber*.

In *Weber*, using the definitions of plan and scheme in *Black's Law Dictionary*, this court determined that a "purposeful design is central to a scheme or plan." 121 Nev. at 572, 119 P.3d at 120. This meaning of common plan or scheme is likewise employed by other jurisdictions that allow joinder based upon two or more acts being part of a common scheme or plan. For instance, the Ninth Circuit has rejected "mere thematic similarity" as a basis for joinder under common plan or scheme, instead requiring the offenses to have a "concrete connection" and to "grow out of related transactions." *United States v. Jawara*, 474 F.3d 565, 574 (9th Cir. 2007) (quoting *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996)). Similarly, Arizona has determined that for offenses to be joined as part of a common scheme or plan "the state must demonstrate that the other act is part of 'a particular plan of which the charged crime is a part.'" *State v. Ives*, 927 P.2d 762, 766, 768 (Ariz. 1996).

In addition to allowing joinder when offenses are part of a common scheme or plan, Arizona and the federal courts allow offenses to be joined when they are of the same or similar character. *See* Fed. R. Crim. P. 8(a); Ariz. R. Crim. P. 13.3(a)(1). However, unlike the rules in Arizona and in the federal courts, Nevada's joinder statute does not contain a provision for joining offenses of "similar" character. The majority overlooks this limitation and reads similarity into "common scheme." In fact, the factors that the majority has set forth for evaluating whether there is a common scheme are nearly identical to the factors federal courts will consider in evaluating whether offenses are of the same or similar character under Fed. R. Crim. P. 8(a). *See Jawara*, 474 F.3d at 578; *United States v. Edgar*, 82

SUPREME COURT
OF
NEVADA

(0) 1947A

3

F.3d 499, 503 (1st Cir. 1996). If our Legislature had intended to allow for joinder based on the similarity of offenses, the Legislature could have expressly done so as provided for in the federal rules. It did not. And we should not expand the types of offenses that may be joined by case law or by a strained reading of "common scheme."

We should be cautious about any expansion of our joinder statute to include similarity of offenses. Joinder based on similarity of offenses has been routinely questioned by courts and commentators. *See Jawara*, 474 F.3d at 575. A number of studies have demonstrated that joinder of offenses against a single defendant in a single trial results in a "bias against the defendant." Kenneth S. Bordens & Irwin A. Horowitz, *Joinder of Criminal Offenses: A Review of the Legal and Psychological Literature*, 9 L. & Hum. Behav., No. 4, 339 (1985). This bias may be due to confusion of evidence, accumulation of evidence across the multiple offenses, or inferences of defendant's criminality. *Id.* at 344-49. Although studies disagree about the nature of the bias, the research indicates an increased likelihood that a defendant will be found guilty in a joined trial. *Id.* The joinder of similar crimes appears to have an even more prejudicial effect than the joinder of dissimilar crimes. Sarah Tanford et. al., *Decision Making in Joined Criminal Trials: The Influence of Charge Similarity, Evidence Similarity, and Limiting Instructions*, 9 L. & Hum. Behav., No. 4, 335 (1985). The findings of the Tanford study further indicated that "joinder effects are stronger with weaker cases." *Id.* at 333. This latter risk is particularly weighty in this case.

Even without the risks of joinder found in cases involving similar offenses, I find problematic that the offenses in this case were quite dissimilar. Although these offenses occurred in a relatively short period of

time at Centennial Hills Hospital, the allegations of misconduct are not similar across all of the cases.[4] For instance, in the charges involving D.H., H.S., and M.P. the alleged misconduct occurred under the guise of patient or medical care, while there is no argument that the alleged offenses against R.C. and L.S. occurred under the guise of medical care. The nature of the contact in the charges involving D.H. and H.S. was different from the contact in the charge involving L.S., and different yet again from the contact in the charges involving R.C. Although all of the victims were patients, there was little consistency between the victims themselves. Only three of the five victims had suffered seizures while one had attempted suicide and the last had an asthma attack. The levels of incapacity varied among the victims from not incapacitated to completely incapacitated. Some of the alleged offenses occurred in front of others while other offenses were alleged to have occurred when Farmer was alone with the victim. The victims varied in age and ethnicity. To the extent that the district court implied sexual gratification could be a common link in these offenses, that could connect a great many crimes and is alone insufficient to warrant joinder. *Cf. Tabish v. State*, 119 Nev. 293, 303, 72 P.3d 584, 590 (2003) (holding that money and greed could connect too many potential crimes to warrant joinder). The flawed focus on similarity to establish a common scheme as well as the actual dissimilarities amongst the charges in this case compel a finding of improper joinder.

I also cannot say that there was not a substantial and injurious effect or influence on the jury's verdict in this case based on the improper joinder. The evidence in this case could hardly be termed overwhelming

---

[4]Farmer concedes that the offenses involving D.H. and H.S. could be tried together.

SUPREME COURT
OF
NEVAOA

(O) 1947A

5

given the discrepancies in testimony. For instance, R.C.'s testimony was contradicted by the testimony of other witnesses. Although a limiting jury instruction was provided in this case to consider each offense separately, such limiting jury instructions have not been found to be effective at eliminating bias against the defendant. Tanford, *supra*, at 321.[5] Further, the State's closing argument linking the victims and stating, "This is what he does," asked the jury to do exactly what the jury should not have done, to accumulate the evidence against Farmer across the multiple charges and infer criminality in his character. The State has not demonstrated that error relating to the improper joinder was harmless and I would vacate the convictions and remand for separate trials.[6]

*Prejudicial joinder*

Even if the joinder were not improper, I believe that the district court should have ordered separate trials based upon prejudicial joinder.

---

[5]In this case, the jury was instructed: "Each charge and the evidence pertaining to it should be considered separately. The fact that you may find a defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other [ ] offense charged."

The Tanford study indicated that only a robust jury instruction that hits upon the potential sources of prejudice to a defendant in a joint trial (inference of defendant's criminality, confusion, and accumulation of evidence) had an effect on guilt findings. Tanford, *supra,* 324, 326. The jury in this case was not provided a robust instruction as the instruction did not develop caution against accumulation of evidence or inference of criminality.

[6]It is important to note here that if charges are improperly joined, the district court must order separate trials and the issue of prejudicial joinder need not be reached. I have nevertheless discussed prejudicial joinder in the next section because the majority concludes that Farmer has not demonstrated that he is entitled to relief on the basis of prejudicial joinder.

SUPREME COURT
OF
NEVADA

(O) 1947A

6

NRS 174.165 provides that the district court may order separate trials when the defendant is prejudiced by a joinder of offenses. NRS 174.165 assumes that the charges are properly joined under NRS 173.115, but tasks the district court with considering whether joinder prejudices the defendant. In assessing a defense request to sever based upon prejudicial joinder, this court has held that the trial court should order separate trials if it would be unfairly prejudicial to the defendant to conduct a joint trial. *See Weber*, 121 Nev. at 571, 119 P.3d at 119. While judicial economy is a consideration weighing in favor of joint trials, the district court should consider among other things whether prejudice will arise from the jury accumulating the evidence against the defendant or lessening the presumption of innocence, whether evidence will spillover that would otherwise be inadmissible if the charges had been tried separately, and whether the defendant may wish to testify as to some charges but not all charges. *Rimer v. State*, 131 Nev., Adv. Op. 36, 351 P.3d 697, 709-710 (2015). This court reviews the district court's decision to deny a motion to sever based upon prejudicial joinder for an abuse of discretion, and the defendant must demonstrate that a trial on joined offenses rendered the trial fundamentally unfair in violation of due process. *Id.*

After reviewing the record before us, I believe the district court abused its discretion in denying the motion to sever based upon prejudicial joinder. The majority suggests that review of the denial of a motion to sever based upon prejudicial joinder is viewed only at the time that the trial court made its decision. However, the Supreme Court has recognized that the district court has an ongoing duty to consider the prejudice of joined charges and grant a severance if prejudice appears. *See Schaffer v. United States*, 362 U.S. 511, 516 (1960); *see also Coleman*, 22 F.3d at 134. Unfair prejudice

Supreme Court
OF
Nevada

(O) 1947A

7

abounds in the record before this court. The evidence for the charges involving each of the victims was weak and presented a close call of guilt, which increased the danger that it would be unfairly accumulated by the jury. This danger was especially increased when the State argued for this very thing in closing arguments. Finally, the interests of judicial economy were only marginally served as there was not much overlapping testimony. *See United States v. Richardson*, 161 F.3d 728, 734 (D.C. Cir. 1998).

Prejudicial joinder requiring reversal is more likely to occur in a close case because it prevents the jury from making a "reliable judgment about guilt." *Weber*, 121 Nev. at 575, 119 P.3d at 122. This is one such case. As previously stated, the evidence in this case was weak. The State argued for accumulation of evidence and inference of criminality. No cross-admissibility analysis was performed by the district court, which allowed evidence inadmissible at separate trials (because there was no determination of cross-admissibility) to be presented in this case. I conclude that under the facts in this case Farmer has demonstrated that joinder of the offenses rendered his trial fundamentally unfair and this warrants reversal and remand for separate trials.

_____, J.
Stiglich

We concur:

_____, C.J.
Cherry

_____, J.
Hardesty

